THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DOCUMENT MANAGEMENT SYSTEMS LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| ALEXA INTERNET, INC.; | § | |
| DOW JONES & COMPANY, INC.; | § | Civil Action No. 1:11-cv-332-SS |
| ELSEVIER B.V.; | § | |
| GOOGLE INC.; | § | JURY TRIAL DEMANDED |
| IAC/INTERACTIVECORP; | § | |
| LEXISNEXIS; | § | |
| LOGIKA CORPORATION; | § | |
| LYCOS INC.; | § | |
| THOMSON REUTERS CORPORATION; | § | |
| WEBMD, LLC; and | § | |
| YAHOO! INC., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' OPPOSITION CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................... 1

II.     OVERVIEW OF PATENT .................................................................................. 2

III.    GENERAL LEGAL STANDARDS .................................................................... 5

    A.      Claim Construction ................................................................................ 5

    B.      Construction of Means-Plus-Function Limitations ................................ 6

IV.     THE MEANS-PLUS-FUNCTION LIMITATIONS ARE INDEFINITE ......................... 7

    A.      The "means for categorizing" and "means for generating a summary"
         limitations must be separately construed under 35 U.S.C. §§ 112, ¶ 6. ............... 9

    B.      The '051 Patent fails to identify an algorithm that corresponds to the
         function of the "means for categorizing" limitation. ........................... 10

         1.      The '051 Patent's description of the "means for categorizing" fails
                to disclose an algorithm. ............................................................. 12

         2.      Mr. Cole's arguments do not and cannot remedy the failure to
                disclose an algorithm for the means for categorizing .............................. 14

    C.      The '051 Patent fails to identify an algorithm that corresponds to the
         function of the "means for generating a summary" limitations. ........................ 16

    D.      The '051 Patent fails to identify an algorithm that corresponds to the
         function of the "means for storing …" ................................................ 18

    E.      The '051 Patent fails to identify an algorithm that corresponds to the
         function of the "means for searching…" ........................................... 21

V.      THE ASSERTED CLAIMS REQUIRE A SPECIFIC CLASSIFICATION OF
    DOCUMENTS AND A SUMMARY PRESENTING THIS CLASSIFICATION
    TO THE USER ................................................................................................ 24

    A.      A "document type" is a classification, where each document falls within
         only one classification that is independent of the document subject matter,
         originating source record, or database in which the document was found. ......... 24

         1.      Each document is associated with only one "document type" ............... 25

         2.      Text, image, and video are not "document types;" they are file
                formats ................................................................................... 27

    B.      The Parties dispute whether a "category of document types" includes
         some, but not all responsive documents of a particular type .............................. 28

    C.      "Summary of the number of documents responsive to the query" for each
         document type / category of document types ...................................... 30

         1.      The Summary Must Include Two or More Document
                Types/Categories of Document Types ...................................... 31

# TABLE OF CONTENTS
(continued)

Page

2.   The Summary Must Contain Both an Identification of Document Types (or Categories) and the Number of Responsive Documents for Each Document Type (or Category) .................................................. 34

3.   The Summary Must Summarize a Single Query and Must be a Single Summary ...................................................................................... 34

VI.   THE '051 PATENT DISCLAIMED SEARCHING LESS THAN SUBSTANTIALLY THE ENTIRE DOMAIN ............................................. 36

   A.   "At least a substantial portion [of such data]" means substantially the entire domain (not just a single database or a few selected databases) or the term is indefinite ..................................................................... 36

   B.   The prosecution history requires "at least a portion" to mean substantially the entire domain (not just a single database or a few selected databases).......... 41

VII.   DMS' SEEKS TO IMPROPERLY EXPAND THE SCOPE OF INFORMATION COVERED BY THE CLAIMS ...................................................................... 42

   A.   The term "document" does not require construction, other than rejecting DMS' attempt to expand the term to "any work of authorship" ......................... 42

   B.   A "source record" is a collection of textual data containing documents that is loaded as a unit .............................................................................. 44

      1.   A "source record" is a collection of textual data. ................................... 44

      2.   A "source record" must be loaded as a unit............................................ 45

VIII.   THE ASSERTED METHOD CLAIMS REQUIRE STEPS BE PERFORMED AND CONTROLLED, IF PERFORMED AT ALL, BY THE USER ........................... 47

   A.   "Presenting" means displaying on an output device ........................................... 47

   B.   "Generating an electronically executable query" means a user entering search information and a system translating same into an electronically executable query ..................................................................................... 49

IX.   CONCLUSION ................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AK Steel Corp. v. Sollac*,
344 F.3d 1234 (Fed. Cir. 2003)..................................................................43

*Aristocrat Tech. v. Int'l Game*,
521 F.3d 1328 (Fed. Cir. 2008)..............................................................7, 22

*Biomedino v. Waters*,
490 F.3d 946 (Fed. Cir. 2007)................................................................6, 9

*BMC Res., Inc. v. Paymentech, L.P.*,
498 F.3d 1373 (Fed. Cir. 2007)..................................................................47

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002)..................................................................5

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
438 F.3d 1374 (Fed. Cir. 2006)..................................................................37

*Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*,
412 F.3d 1291 (Fed. Cir. 2005)..................................................................8

*Ergo Licensing, LLC v. Carefusion*,
673 F.3d 1361 (Fed. Cir. 2012)..............................................................7, 11

*Exxon Research & Eng'g Co. v. United States*,
265 F.3d 1371 (Fed. Cir. 2001)..................................................................6

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
493 F.3d 1358 (Fed. Cir. 2007)..................................................................5

*KLA-Tencor Corp. v. Xitronix Corp.*,
No. 1:08-cv-723-SS (W.D. Tex. Jan. 31, 2011) ...............................................40

*Lemelson v. Gen. Mills, Inc.*,
968 F.2d 1202 (Fed. Cir. 1992)..................................................................39

*Marine Polymer Techs. v. Hemcon, Inc.*,
2010-1548 (Fed. Cir. March 15, 2012) ..........................................................37

*Med. Instr. and Diagnosis v. Elekta*,
344 F.3d 1205 (Fed. Cir. 2003)..............................................................6, 9

*Noah Systems, Inc. v. Intuit Inc.*,
  2012 U.S. App. LEXIS 7094 (Fed. Cir. April 9, 2012) .....................................................7, 8, 9

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003)..................................................................................................39

*Paid Search Engine Tools, LLC v. Yahoo! et al.*,
  Memorandum Opinion and Order, Case No. 1:07-cv-403 (E.D. Tex. Sept. 13, 2007) ...........49

*Phillips v. AWE Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005).......................................................................................5, 6, 39, 43

*Seattle Box Co. v. Indus. Crating & Packing, Inc.*,
  731 F.2d 818 (Fed. Cir. 1984)....................................................................................................40

*Sitrick v. Dreamworks*,
  516 F.3d 993 (Fed. Cir. 2008)....................................................................................................43

*Spectrum Int'l v. Sterilite Corp.*,
  164 F.3d 1372 (Fed. Cir. 1998)..................................................................................................40

*Telcordia Techs., Inc. v Cisco Sys., Inc.*,
  612 F.3d 1365 (Fed, Cir. 2010)................................................................................................6, 7

*U.S. v. Teletronics, Inc.*,
  857 F. 2d 778 (Fed. Cir. 1988)....................................................................................................6

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
  587 F.3d 1339 (Fed. Cir. 2009)...................................................................................................6

*WMS Gaming Inc. v. International Game Technology*,
  184 F.3d 1339 (Fed. Cir. 1999)..............................................................................................7, 18

## RULES AND STATUTES

35 U.S.C. §§ 112, ¶ 6............................................................................................... 1, 2, 6-9 , 18, 21

## OTHER AUTHORITIES

INTERMEDIATE SEARCHING ON DIALOG (1992) .....................................................................2, 3

http://www.merriam-webster.com/dictionary/different.................................................................32

http://www.merriam-webster.com/dictionary/multiple .................................................................31

http://www.merriam-webster.com/dictionary/various ..................................................................32

Online Oxford English Dictionary................................................................................................49

## EXHIBITS

U.S. Patent No. 5,634,051……………………………………………………..Exhibit A

May 18, 1995 Response to Office Action………………………………………..Exhibit B

Intermediate Searching on DIALOG…………………………….……………Exhibit C

June 27, 1996 Preliminary Amendment…………………………………………Exhibit D

Transcript from March 26, 2012 Deposition of Joe Tipton Cole………….………Exhibit E

Joint Claim Construction Statement……………………………….……….Exhibit F

Expert Report of Ray R. Larson, PhD…………………………………….……...Exhibit G

May 1, 2012 Letter from R. Zembek to J. Biggers……………………………Exhibit H

May 7, 2012 Email from J. Biggers to R. Zembek……………………….………Exhibit I

*Marine Polymer Techs. v. Hemcon, Inc.*, 2010-1548 (Fed. Cir. Mar. 15, 2012)…Exhibit J

*KLA-Tencor Corp. v. Xitronix Corp.*, No. 1:08-cv-723-SS (W.D. Tex. Jan. 31, 2011)………………………………………………………………...Exhibit K

*Paid Search Engine Tools, LLC v. Yahoo!, et al.*, Memorandum Opinion and Order, Case No. 1:07-cv-403 (E.D. Tex. Sept. 13, 2007) ….………..Exhibit L

Online Oxford English Dictionary definition for "present"……...…….……….Exhibit M

Defendants' Proposed Constructions…………………………………………..Exhibit N

## I.     <u>INTRODUCTION</u>

The parties' claim construction disputes fall into primarily four areas.

First, the parties dispute whether the patent includes sufficient disclosure to support several means-plus-function limitations.  The parties agree that (1) these limitations are governed by 35 U.S.C. § 112, ¶ 6, (2) the only physical structure that could possibly correspond to the recited functions are general-purpose computers, and (3) the specification must disclose a step-by-step algorithm on ***how*** to perform the recited functions.  DMS takes a kitchen-sink approach to identifying a purported algorithm, citing to hundreds of lines of specification, as well as expert-created flowcharts and bulleted lists not actually found in the patent.  The majority of these citations and expert creations have little or no relation to the recited function, and those that do merely describe it in purely functional (rather than instructional) language.  That is, the '051 Patent specification describes ***what*** is to be done, but not ***how*** to do it.  Because the specification fails to describe ***how*** to perform the recited functions, it has failed to live up to the § 112, ¶ 6 bargain, and the claims are indefinite.

Second, DMS improperly seeks to remove from the claims the particular classification scheme of documents required by the claims and emphasized in the intrinsic record.  The specification and file history emphasize the importance of the concepts of "document type" and "categories of document types," as well as the value of presenting a summary based on these concepts.  Yet, in each case, DMS proposes constructions that would effectively read these limitations out of the claims.  DMS also seeks to expand the definitions of "document" and "source record" well beyond their ordinary meaning and the scope contemplated by the inventor or contemplated in the intrinsic record.

Third, DMS improperly seeks to remove from the claims the requirement of searching substantially the entire domain of data.  DMS does so despite the fact that the inventor

emphasized this requirement throughout the intrinsic record. The specification and file history include no less than five separate disclaimer statements emphasizing the importance of searching substantially the entire domain of data and "not just a single database or a few selected databases" to distinguish prior art.

Fourth, DMS improperly seeks to rewrite claim language that requires user action simply because DMS has realized that such language creates an infringement proof issue. The asserted method claims include steps of "presenting a summary" and "generating an electronically executable query," which require action by the user's computer (presenting) or the user (generating). In contrast, Defendants' proposed constructions of these terms focus on the plain language of the terms and the specification. DMS' constructions do not interpret, but rather rewrite the terms in an unabashed attempt to address infringement proof problems.

## II.   <u>OVERVIEW OF PATENT</u>

The '051 Patent discloses "[a]n information storage, searching and retrieval system for large (gigabytes) domains of archived textual data." Ex. A, '051 Patent at Abstract. Such systems were not new at the time of the '051 Patent's priority date (October 1993), and, in fact, the '051 Patent specification and the prosecution history both reference an existing prior art system known as Dialog. *See, e.g.*, *id.* at 10:22-23 ("… in contrast to existing information retrieval systems such as Dialog, etc."); Ex. B, 5/18/95 Resp. to OA at 3 ("Applicant's invention is fundamentally different from the Dialog system in several critical aspects.").

The improvements that the '051 Patent sought to claim are best understood with reference to Dialog, which at the time billed itself as "the world's largest databank of information." Ex. C, INTERMEDIATE SEARCHING ON DIALOG (1992), DMS PRO 267-71 at 267. Dialog included a domain of "more than 400 different information collections known as databases." *Id.* In Dialog, to perform a search, the user first selected one or more databases

(files) to search and then entered a Boolean search string.  *See id.* at DMS PRO 269.  The search

result screen then displayed the number of responsive documents for each file.  *See id.*  Figure 1,

below, shows (a) a Dialog search result screen on the left compared to (b) the search result

screen in Figure 3 of the '051 Patent on the right.



**Figure 1**

The applicant distinguished the '051 Patent from Dialog in both the specification and file

history on two main bases: (a) a particular manner of classifying documents; and (b) searching

substantially the entire domain of data – as opposed to a single or a few selected databases.

First, addressing the particular classification of documents, the applicant explained:

"Applicant's claim 1 includes the following four concepts: (1) source record, (2) document, (3)

document type, and (4) categories (of document types)."  Ex. D, 6/27/96 Prelim. Amend. at 3.

"[A] source record could be a newspaper or magazine.  Such a source record may include several

different types of documents – e.g., news articles, editorials, advertisements, feature columns,

etc."  5/18/95 Resp. to OA at 4.  The invention requires that at least some source records include

documents of multiple document types.  *See, e.g.*, '051 Patent at Claim 1.

A "document type" is not simply any classification of documents.  The specification

explains (and the parties agree) that the "document type" for a document cannot be based on the

subject matter of the document.  *See id.* at 10:49-64.  It goes on to define "document type"

primarily by listing examples such as "editorials, regular columns, feature articles, news, product announcements, and a calendar of events."  *Id.* at 8:62-63; *see also id.* at Fig. 5.   The specification also limits document types to be "independent[] of the source record from which [the] documents were obtained."  *Id.* at 2:32-33.   The applicant reinforced that limitation in the prosecution history by arguing that the search results listed in the prior art Dialog system were not listings of "document types" because a "document type" is "irrespective of source document or source database."  5/18/95 Resp. to OA at 6.

Further, the specification describes the use of "categories" of document types to facilitate summarizing search results "differently for the two individuals, each being tailored to their particular needs."  '051 Patent at 9:35-37.   To accomplish this, a "category" aggregates one or more "document types" and different sets of categories are used for different users: "***Sometimes these categories may have a one-to-one relationship with the document types*** (for example, patents may be both a document type and a category)" and sometimes "***these categories may be comprised of several document types*** (for example, for some users product announcements, product reviews, and product specifications may be grouped into a category labeled 'product information')."  *Id.* at 10:23-30.[1]   Thus, a set of categories is selected for each user and the summary in response to a search will include a report of all responsive documents for the document types within each category.  *See id.* at 9:25-37.   The applicant in the file history emphasizes that the claimed summary by document type, "present[s] to the user information responsive to a query in a much more usable fashion."  5/18/95 Resp. to OA at 3.

Turning to the second purported distinguishing feature, the specification explains that "in a typical on-line system," such as Dialog, "only documents contained in the selected database are

---

[1] All emphasis added unless otherwise indicated.

identified" in search result, but "[i]n contrast, *the system of the invention [] searches substantially its entire domain (not just a single database or a few selected databases)*." *Id.* at 10:49-64.    Then, in four separate passages in the file history, the applicant continued to emphasize the importance of searching substantially all databases, calling it "*a fundamental difference between Dialog and Applicant's system*."    5/18/95 Resp. to OA at 8-9; *see also* 6/27/96 Prelim. Amend. at 4.    The applicant explained that searching substantially all of the domain is advantageous because it "does not exclude supposedly irrelevant groups of data (in contrast to Dialog)."    5/18/95 Resp. to OA at 8-9.

## III.    GENERAL LEGAL STANDARDS

### A.    Claim Construction

When construing claims, courts begin with "an examination of the intrinsic evidence, i.e. the claims, the rest of the specification and, if in evidence, the prosecution history."    *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).    The words in the claims themselves are of primary importance in the analysis.    Both the plain language of the claims and the context in which the various terms appear "provide substantial guidance as to the meaning of particular claim terms."    *Phillips v. AWE Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005).

The specification also plays a significant role in the analysis.    The Federal Circuit has repeatedly confirmed the principle that the specification "is always highly relevant .... Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."    *Id.* at 1315 (internal quotation omitted).    "When a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term."    *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007).

The other form of intrinsic evidence courts consider is the prosecution history.    The prosecution history will "often inform the meaning of the claim language by demonstrating how

the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.  The prosecution history "limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *See U.S. v. Teletronics, Inc.*, 857 F. 2d 778, 782 (Fed. Cir. 1988).

Finally, a claim is ***definite*** if "one skilled in the art would understand the bounds of the claim when read in light of the specification." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). However, a claim is ***indefinite*** if it is "not amenable to construction or [is] insolubly ambiguous." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352 (Fed. Cir. 2009).

### B.    Construction of Means-Plus-Function Limitations

Construction of a means-plus-function element under 35 U.S.C. § 112, ¶ 6 encompasses two steps: "1) the court must first identify the function of the limitation; and 2) the court must then look to the specification and identify the corresponding structure for that function." *Biomedino v. Water*s, 490 F.3d 946, 950 (Fed. Cir. 2007).  "If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee" has impermissibly attempted "to claim in functional terms unbounded by any reference to structure in the specification." *Med. Instr. and Diagnosis v. Elekta*, 344 F.3d 1205, 1211 (Fed. Cir. 2003); *see also Telcordia Techs., Inc. v Cisco Sys., Inc.*, 612 F.3d 1365, 1376 (Fed, Cir. 2010) (holding that "the written description must clearly link or associate structure to the claimed function" to satisfy the definiteness requirement of § 112, ¶ 2).  And "[i]f an applicant fails to set forth an adequate structure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of § 112.'" *Biomedino*, 490 F.3d at 948 (quotation omitted).

"In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming Inc. v. International Game Technology*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). Language that "simply describes the function to be performed [is] not the algorithm by which it is performed." *Aristocrat Tech. v. Int'l Game*, 521 F.3d 1328, 1334 (Fed. Cir. 2008). And, if a "disclosed algorithm supports some, but not all, of the functions associated with a means-plus-function limitation," the specification is treated "as if no algorithm has been disclosed at all." *Noah Systems, Inc. v. Intuit Inc.*, 2012 U.S. App. LEXIS 7094, at *28-29 (Fed. Cir. April 9, 2012). The disclosed algorithm must be a "step-by-step procedure for accomplishing a given result." *Ergo Licensing, LLC v. Carefusion*, 673 F.3d 1361, 1365 (Fed. Cir. 2012).

## IV.    THE MEANS-PLUS-FUNCTION LIMITATIONS ARE INDEFINITE

Claims 1, 10, 14, and 22 are apparatus claims that each include four means-plus-function limitations: (1) "means for categorizing;" (2) "means for generating a summary;" (3) "means for storing;" and (4) "means for searching" (collectively, the "§ 112, ¶ 6 Limitations"). The Parties agree that these limitations require construction under § 112, ¶ 6 and the corresponding structure cannot be simply a general purpose computer. Rather, the required corresponding structure is a special purpose computer programmed to perform a step-by-step algorithm that must be found in the specification. *See, e.g.,* Plaintiff's Opening Claim Construction Brief, (Doc. 101) at 13, 29, 34 (hereinafter "DMS Br.").

Because "the written description must clearly link or associate structure to the claimed function," identification of corresponding structure should be a straight-forward process. *Telcordia Techs., Inc.*, 612 F.3d at 1376. Here, the parties appear to agree that the necessary

structure must include an algorithm.  Yet, nowhere over the course of its 28-page discussion of

the § 112, ¶ 6 Limitations does DMS ever identify such a linkage.  Instead, DMS throws as much

of the specification against each of the functions as possible, hoping that something will stick

and further hoping that the something amounts to the required algorithm.  *See* DMS Br. at 12-39.

In doing so, DMS presents lengthy quotes from the specification rather than identifies

specific structures, making it unclear what DMS argues amounts to corresponding structure for

each § 112, ¶ 6 Limitation.   DMS' current position appears to be that the laundry list of

specification citations it identifies for each limitation is clearly linked to and collectively

amounts to corresponding structure for each respective function.  *See* DMS Br. at 14-39.  This

position is at odds with its expert, Mr. Tipton Cole, who explained under oath that each of the

separate specification recitations is independently alleged to be sufficient and separate alternative

structure.  *See, e.g.,* Ex. E, Cole Dep. at 109-122.  That DMS has changed its position is telling

yet ultimately fruitless, because the cited recitations, whether separated or combined, do not

amount to an algorithm.  Moreover, beyond the issue of indefiniteness, DMS' laundry list of

specification citations are unworkable as "constructions."  It is unclear how the Court, let alone a

jury, could use these "constructions" to perform infringement or invalidity analysis.

Ultimately, in a transparent attempt to create the required algorithmic disclosure where

none exists in the '051 Patent, DMS turns to extrinsic evidence: testimony from and flow charts

created by Mr. Cole.  "Because the specification ... discloses no structure corresponding to the

claimed function," DMS "cannot use the declaration of its expert to rewrite the patent's

specification."  *See Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291,

1302 (Fed. Cir. 2005).  As the Federal Circuit recently confirmed, expert testimony has no

relevance when the required structure is absent. *Noah Systems*, 2012 U.S. App. LEXIS 7094, at

*24 (explaining that "[w]hile it is certainly true that the sufficiency of the disclosure of algorithmic structure must be judged in light of what one of ordinary skill in the art would understand the disclosure to impart, in a situation in which the specification discloses no algorithm, that principle has no application").

The '051 Patent does not include a step-by-step procedure for performing any of the recited functions, but rather includes only purely functional language that does not rise to the level necessary to support a means-plus-function claim.  *See id.* at *33 ("[P]urely functional language, which simply restates the function associated with the means-plus-function limitation, is insufficient to provide the required corresponding structure.").  DMS "has not paid the price [for means-plus-function claiming,] but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification."  *Med. Instr.*, 344 F.3d at 1211; *see also Biomedino*, 490 F.3d at 948 ("[I]n return for generic claiming ability, the applicant must indicate in the specification what structure constitutes the means.").

In the following sections, Defendants address DMS' arguments related to the corresponding structure of the § 112, ¶ 6 Limitations and demonstrate the absence of the required algorithm structure for each limitation.

## A.  The "means for categorizing" and "means for generating a summary" limitations must be separately construed under 35 U.S.C. §§ 112, ¶ 6.

The Parties initially agreed that the recited functions of the "means for categorizing" and "means for generating a summary" track the language of the actual claims.  *See* Ex. F, Jt. Stmt., at 2.  In its brief, however, DMS impermissibly combines these two independent functional limitations into one and attempts to identify structure linked to the new combined function.  *See* DMS Br. at 12-28.  The Court should adopt the Parties' previously proposed functions and separately construe each limitation.

Specifically, the Parties agreed that the recited function of the "means for categorizing" is "categorizing documents responsive to the query based on document type." Jt. Stmt. at 2. As to variations of the function for each "means for generating a summary," the Parties further agreed that the functions are as follows:

> Claims 1 and 10: "generating a summary of the number of documents responsive to the query which fall within various predetermined categories of document types;"

> Claim 14: "generating a summary of the number of documents responsive to the query which fall within each of the document types;" and

> Claim 22: "generating a summary of the number of documents responsive to the query which fall within various categories of one of such predetermined sets of categories."

*Id*. Each of these recited functions requires distinct supporting algorithmic structure in the specification. The two phrases recite separate functions, and the '051 Patent must clearly link corresponding structure to each separate function. It does not.

### B.    The '051 Patent fails to identify an algorithm that corresponds to the function of the "means for categorizing" limitation.

DMS has, in essence, conceded that the '051 Patent fails to lay out in either figures or prose an algorithm that performs the function of "categorizing documents responsive to the query based on document type." Despite his flow charts and expert report, even DMS' own expert ultimately admits as much. When asked under oath if the patent explains how to determine the "type" of a document for categorizing, Mr. Cole admitted that the specification:

> ***doesn't tell you***, you know, these are – these are the words you use to categorize things. ***It just says, look, the words are available to categorize things, and then you do what you need to do for each application that you have. This is a general purpose capability … that's being defined here.***

Cole Dep. at 51:19-52:20.

Mr. Cole's expert report and testimony is based upon the mistaken assumption that non-

descript language is sufficient to constitute the required structure as a matter of law.  In his deposition, Mr. Cole stated that he believed that an algorithm need not contain step-by-step instructions for accomplishing a result:

> Q.  Would you mind telling the jury what an algorithm is?
>
> A.   Generally speaking, an algorithm is a characterization of how to –
> how to solve a problem.
>
> Q.  So is it like step-by-step instructions for how to solve a problem?
>
> A.  It can be. ***Not necessarily.***

*Id.* at 10:14-20.  He is wrong.  As the Federal Circuit has repeatedly explained, that is exactly what is required – the "algorithm" that must be disclosed is a "step-by-step procedure for accomplishing a given result."  *Ergo Licensing,* 673 F.3d at 1365.

Because the '051 Patent specification fails to provide the requisite step-by-step procedure for performing the recited function of the "means for categorizing," Mr. Cole created his own series of charts (not found anywhere in the '051 Patent) purportedly illustrating such a procedure.  *See* DMS Br. at 15-19.  Even these flow charts are inadequate because they have no relationship to the recited function[2] and do not constitute an algorithm to perform it.  Simply put, neither the disclosure in the '051 Patent nor Mr. Cole's made-for-litigation "evidence" contains the algorithmic support required for § 112, ¶ 6 claims by the Federal Circuit.

---

[2] For example, the claims of the '051 Patent separately require a means for storing, searching, categorizing, generating a summary, and customizing the summary (found in unasserted dependent claims 2, 12, and 16).  Despite the legal requirement for algorithmic structure that corresponds to each function, DMS argues that searching (DMS Br. at 15, Fig 1, 102-124), loading and searching (DMS Br. at 17, Fig. 2, 202-216), and customizing a summary (DMS Br. at 19, Fig 3) somehow corresponds to the separately-required function of "categorizing documents responsive to the query based on document type [including] generating a summary of the number of documents responsive to the query which fall within various predetermined categories or document types."  DMS Br. at 13.  It does not.

1.      **The '051 Patent's description of the "means for categorizing" fails to disclose an algorithm.**

DMS argues that the corresponding structure for the "means for categorizing" is found in four lengthy excerpts from the '051 Patent: (1) column 4, lines 45-60; (2) column 5, lines 13-24; (3) column 8, line 58 – column 9, line 67; and (4) column 10, lines 1-30.[3]  DMS Br. at 14-23.  In the Joint Claim Construction Statement, DMS also pointed to column 3, lines 21-28 as providing support for the "means for categorizing," but it has since dropped that section in favor of sections 1 and 4 above, which it added as structure for the first time in its brief.  *See id.*; Jt. Stmt. at 16-21.  But as explained in the Expert Report of Dr. Ray R. Larson, "nothing in [the potentially relevant] passages, or anywhere else in the specification, discloses adequate structure clearly linked to the recited function."  Ex. G, Larson Rep. at ¶ 23.  The portions of the specification even arguably related to the actual recited function are all functional in nature – *i.e.*, they merely describe ***what*** function is to be performed rather than ***how*** that function is or could be performed.  *Id.* at ¶ 27.

DMS' first lengthy block quote has little to do with the means for categorizing, and only briefly mentions, in purely functional language, that "[as search] results are received each document returned is identified by document type and ***assigned to a particular category*** in a predetermined set of categories."  '051 Patent at 4:45-60.  The second quote DMS cites provides more of the same, again identifying ***what*** to do, rather than ***how*** to do it: "[a]s illustrated in the block diagram of FIG. 1, the information retrieval system of the invention includes … ***an organizing process*** …." '051 Patent at 5:13-23.  The only part of Figure 1 that arguably illustrates "categorizing documents responsive to a query" is a box that states ***what*** is done – "results of search ***are organized*** into groups of documents" – but not ***how*** to do it.  *Id.* at Fig. 1.

---

[3] These citations cover a total of 125 lines of text, much of which is wholly unrelated to the claimed function.  For example, column 4, lines 45-60 describes the SAS system "broadcast[ing] the user's search to the complex of search machines" and waiting for return results.

DMS' third quote from the specification, which spans over a column of text, mostly describes the relationship between "document types" and "categories of document types" through an example that begins with a "document loading process." *See id.* at 8:58-9:67. The only portion of this quote that is arguably related to the recited function of "categorizing documents responsive to the query based on document type" is, once again, purely functional. Specifically, the language from the patent reveals only that the system automatically utilizes the categories, but fails to explain how the claimed function is performed. *Id.* at 9:7-14 ("When a user corresponding to type #1 executes a search, *the system automatically utilizes the categories* of set #1, corresponding to that particular type of user, in organizing the results of the search for review by the user. When a user from type #2 executes a search, however, the *system automatically utilizes the categories* of set #2 in presenting the search results to the user.").

This lengthy quote also references a "text analysis process." *Id.* at 9:13-19. But this process is related to document loading, not a later activity "responsive to [a user] query," as required by the recited function. In any event, the text analysis process is described in nothing more than functional terms: "[W]hen the magazine is loaded into the system, *a text analysis process identifies each unique document type* within the magazine with a code, and this code is utilized by the system in conjunction with the predetermined sets of categories to organize search results by document types into categories at the end of each search." *Id.* That is, "'text analysis process' is a description of a function (text analysis), not a particular series of steps (*i.e.*, an algorithm) for actually performing the function." Larson Rep. at ¶ 28.

The final lengthy quote DMS relies on as providing the necessary support for the "means for categorizing" is similar to those above: it is largely irrelevant, and provides no guidance as to *how* any sort of categorization is to take place. The one mention of categorization is, like the

others, purely functional: "As indicated above, the sorting process takes query search results and *sorts all relevant document[s]* identified as meeting the search criteria into the predetermined categories of documents . . . " '051 Patent at 10:1-30 (emphasis added).

The excerpt from the '051 Patent that DMS relied on in the Joint Claim Construction Statement, but did not include in its brief, contains functional language almost identical to that in the quotes DMS now relies on. *Id.* at 3:21-28 ("When all results are reported (i.e., all columns have indicated they are finished), the SAS 24 organizes the documents into the above-described categories…."). In short, nothing in the specification provides the required algorithmic structure for the "means for categorizing" claim element. The claims containing that element are subsequently indefinite under binding Federal Circuit law.

> ### 2. Mr. Cole's arguments do not and cannot remedy the failure to disclose an algorithm for the means for categorizing

Even if it were legally permissible for Mr. Cole to rewrite the '051 Patent, which it is not, even Mr. Cole *still* fails to provide an actual algorithm – a step-by-step procedure – for carrying out the function of "categorizing documents responsive to the query based on document type." Instead, Mr. Cole merely extracts purely functional language from the '051 Patent and inserts it in a variety of boxes in flow charts and bullet-pointed lists. Like DMS' quotes, the vast majority of these boxes and bullets have no relation to the claimed function.

Mr. Cole purportedly created Figure 1 in his rebuttal report based upon the text that appears at column 4, lines 45-60, which neither he nor DMS had previously identified as corresponding structure, and this is addressed above. *See* DMS Br. at 15. Regardless, only a single box in this figure relates to the function of the "means for categorizing."



*Id.* at Fig. 1 (excerpted).  Like the '051 Patent, this box uses functional language that fails to disclose a step-by-step algorithm for carrying out the "categorizing function."

Next, Mr. Cole purportedly created Figure 2 from the text that appears at column 5, lines 13-24, also discussed above.  *Id.* at 17.  Similar to the '051 Patent, this figure once again provides a purely functional description of the "means for categorizing:"



*Id.* at Fig. 2 (excerpted).

Finally, Mr. Cole purportedly created Figure 3 from the text that appears at column 8, line 58-column 9, line 13.  *Id.* at 19.  This text relates to the document loading and text analysis process discussed above.  Mr. Cole's figure confirms that much of this discussion relates to the document loading process, not the recited function of "categorizing documents responsive to the query based on document type."  Moreover, the only arguably relevant portion of the flowchart once again at best tells one *what* to do – "categorize or group into categories contained in sets of categories" – and not, as is required, *how* to do it:



*Id.* at Fig. 3 (excerpted).  In short, Mr. Cole's and DMS' made-for-litigation flow charts fail to provide any step-by-step algorithm required to support the "means for categorizing."

DMS similarly argues that the four bulleted lists that Mr. Cole created are algorithms with sufficient disclosure to support the "means for categorizing" claim elements.  *See* DMS Br. at 21-24.  Like the flow charts discussed above, these bulleted lists do not contain anything other than functional language – language that merely recites what is to be done and not how to do so. *E.g. id.* at 24 ("Sorting all relevant documents identified as meeting search criteria into predetermined categories of documents that are specific to the category set corresponding to the user.").  As such, Mr. Cole's and DMS' bulleted lists also fail to provide any step-by-step algorithm required to support the "means for categorizing."

In sum, one of ordinary skill in the art reading the patent knows that, in the described system, documents responsive to a user query are to be categorized by type.  But not even DMS' expert can point to – or even fabricate – any disclosure that specifies any algorithm for ***how*** to carry that process out.  As Dr. Larson explained, the '051 Patent "does not identify any particular one of the countless possible structures that could be used to perform the claimed functions." Larson Rep. at ¶ 25.  As such, the '051 Patent fails to satisfy the bargain for functional claiming and the means-plus-function claims are indefinite.

### C.   The '051 Patent fails to identify an algorithm that corresponds to the function of the "means for generating a summary" limitations.

The previously-agreed-to recited functions of the "means for generating a summary" limitations are discussed above.  DMS initially argued that the corresponding structure for these functions are found at: (1) column 5, lines 13-24, (2) column 7, lines 45-50, and (3) column 10, lines 60-65.  *See* Jt. Stmt. at 21-22.  Of these three specification quotes, DMS now points only to the first, presumably abandoning any argument that the others amount to corresponding structure.

*See* DMS Br. at 24-28.   Though not previously identified by either DMS or Mr. Cole as corresponding structure, in its brief, DMS now argues for the first time that (1) column 5, lines 45-60, (2) column 8, line 58 – column 9, line 13, (3) column 10, line 31-37, (4) column 4, lines 11-28, and (5) column 9, lines 25-40 also disclose the required algorithmic structure.  *See id.* at 15-17, 19, 24, 26-27.  DMS is wrong.

That DMS has again shifted its arguments further illustrates the absence of an algorithm in the specification.  The remaining one of its original quotes also fails to provide an algorithm that performs the function of "generating a summary of the number of documents responsive to the query which fall within various predetermined categories of document types" or the other similar functions of the four "means for generating a summary" limitations.  Indeed, DMS does not and cannot associate this quote with the recited function, which says nothing about a summary of the number of documents.  *See* '051 Patent at 5:13-24 ("Once the sorting is complete, search results are presented by category to the user.").

DMS' newly-identified quotes fare no better.  For example, the identified language from column 9 states that the categories "are all summarized" and "the answer set will be summarized," but fails to explain with a step-by-step algorithm how the recited function should come to pass.  *Id.* at 9:25-41.  The other newly-identified descriptions contain similarly inadequate functional language.  *See, e.g., id.* at 4:15-19 ("In this mode the SAS system 24 generates screens of display and monitors the keyboard responses entered by the user to establish the information sought and present the search results by category."); 10:31-34 ("The results of the search and sorting processes are presented to the user summarized by categories along with the number of documents in each such category."); 5:45-60 ("As these results are received each document returned is identified by document type and assigned to a particular category in a

predetermined set of categories."); 8:58-9:13 ("…sources of information (i.e. source records) can be sorted into many document types and then subsequently into categories…").

As with the "means for categorizing" element, DMS improperly attempts to fill in the missing parts of the specification with Cole-created bulleted lists.  *See* DMS Br. at 15-19, 24-28. But like the lists above, these lists merely parrot the functional language from the specification. For example, DMS mistakenly argues that bald words "generating screens," "controlling the end user's display screen," and "providing the look and feel of end user activity" somehow provide the necessary algorithmic support for "generating a summary."  *Id.* at 26.  DMS' contrived lists do not (and under the controlling law, cannot) provide the missing algorithm structure.

Because DMS has not disclosed sufficient structure to uphold its part of the § 112, ¶ 6 bargain, the "means for generating a summary" claim limitations are indefinite.

### D.    The '051 Patent fails to identify an algorithm that corresponds to the function of the "means for storing …"

The parties agree that the function of the "means for storing" limitation in Claims 1, 14, and 22 is "storing a large domain of data contained in multiple source records, at least some of the source records being comprised of individual documents of multiple document types."  The parties also agree that the function of the "means for storing" limitation in Claim 10 is "storing a large domain of data contained in multiple document types.  To the extent a corresponding structure is disclosed, that structure is SAS 24, which is nothing but a general-purpose computer requiring a corresponding algorithm to amount to sufficient structure.  *See WMS Gaming, Inc.*, 184 F.3d at 1349.

DMS again attempts to cobble together a "storing" algorithm out of disparate parts of the specification.  The "algorithm" identified by DMS is insufficiently descriptive, failing to detail how one of ordinary skill in the art should or even could implement the claimed function.  For

example, DMS insists that the functional "step" of "loading the electronic form of the documents into *appropriate* search engines of a system for storing a large domain of data" is part of the algorithm of the means for storing. *See* DMS Br. at 31.  The specification, DMS, and Mr. Cole collectively fail to specify *how* the system chooses an "appropriate" search engine beyond this purely functional language.  Once again, DMS provides a purported algorithm of nothing but functional language referencing *what* is to be done, not *how* it is to be done.

The '051 Patent discloses the storing of documents on a grid of computers, arranged into "rows" and "columns."  '051 Patent, 5:24-35.  This arrangement is displayed in the excerpt of Figure 2, showing Search Engine 1, Search Engine 2, Search Engine 3, all the way to Search Engine N:



The specification description of Figure 2 explains that the system is "organized in columns."  '051 Patent at 5:66-6:6.  Each of the Search Engine Systems in these columns "may, if desired, have very different architectures and search algorithms, as may be desired based on the type of material (*i.e.*, documents) they manage."  *See id.* at 5:34-35.  Thus, any algorithm must take into account the architecture and search algorithm of each of the columns and place incoming documents into an appropriate column. The specification, however, provides no disclosure as to how the system determines which documents go into which column.  Thus, no

step-by-step process is disclosed, and the claims are indefinite.

In fact, DMS' current position of amalgamating disparate portions of the specification into one "algorithm" is at odds with its expert.  As Mr. Cole testified, he enumerated **eight** "separate alternative mechanisms sufficient to implement the means for storing."  Cole Dep. at 109:8-13.   When  asked  to  "enumerate  those  separate  alternative  mechanisms,"  Mr. Cole responded as follows:

     1.  Column 8, Lines 4 to 10;

     2.  Column 8, Lines 4 through 15;

     3.  Column 8, Line 4 through 21;

     4.  Column 8, Lines 22 through 27; Column 9, Lines 13 through 16;

     5.  Figure 1; Column 3, Lines 1 -- 21 through 28;

     6.  Column 10, Lines 1 through 5;

     7.  Column 4, Lines 37 through 45; Column 5, Lines 4 through 27; and

     8.  Column 8, Lines 28 to 33.

*See id.* at 109:14-113:8.

As a result, Defendants carefully and repeatedly questioned Mr. Cole at his deposition whether he was contending that these were "distinct" and "separate" mechanisms to embody the means for storing, and Mr. Cole answered "yes" each time.  DMS now takes the position that these items **combined** constitute an algorithm for the "means for storing."  DMS Br. at 31. Regardless, as explained above, whether combined or separate, nothing in the '051 Patent specification provides sufficient detail on **how** to perform the function of the "means for storing."

**E.    The '051 Patent fails to identify an algorithm that corresponds to the function of the "means for searching…"**

The agreed-upon function of the "means for searching" element is "searching at least a [substantial] portion of such data based on a search query to identify documents of multiple types responsive to the query."  The structure for performing the "means for searching" are general purpose computers, SAS 24 and all Search Engine Systems ("SES" 26, 27, 28, etc.), and optional search clones).  Because the specification does not disclose a suitable algorithm for the general purpose computer to perform the stated function, the phrase should be found indefinite.

DMS cites to a pages-spanning quote from the specification that it contends is the "algorithmic structure … that performs the function of searching at least a [substantial] portion of such data … includes at least the following …."  *See* DMS Br. at 37-39.  DMS' proposed algorithm fails to satisfy the requirements of 35 U.S.C. § 112 for many reasons.

First, in an effort to find any support for the algorithm, DMS' purported algorithm includes steps unrelated to the claimed function of "searching at least a [substantial] portion of such data based on a search query to identify documents of multiple types responsive to the query."  For example, DMS' purported algorithm includes the steps that would typically be associated with the storage of documents or initial setup of the search system, including "identifying documents …," "replicating search data cross search engines …," and "structuring the search system …."  DMS does not and cannot explain how the stated steps are clearly linked to the agreed function of "means for searching," which would be required for the Court to adopt its purported algorithm as corresponding structure for the means for searching.

Second, while DMS lists many steps as a purported algorithm, the actual steps to perform the stated function are not explained in the specification.  For example, one of the steps in DMS' purported algorithm is "searching simultaneously across instances of search data that is

replicated across search engine and search engine clones – effecting predictable response times." DMS Br. at 39.  This is a statement of *what* – not *how* – to search.  As shown in Figure 2 (see above), the data in the '051 Patent is distributed across multiple computers.  As such, the disclosure on how to coordinate searching across those many computers is important, and not discussed at all in the specification.

While DMS purportedly provides several algorithmic steps for searching *within* each Search Engine or each Search Clone (*e.g.*, searching with a Boolean search, searching with a vectoral search, searching with a probabilistic search, etc.), there is no algorithm disclosed that is sufficient to allow one of ordinary skill in the art to actually implement the means for searching across a distributed computer environment as described in the specification.  *See* DMS Br. at 39.  Therefore, the "means for searching" claim element is indefinite.

Moreover, the "algorithm" DMS cites to actually perform the search, *i.e.,* "searching simultaneously across instances of search data that is replicated across search engine and search engine clones – effecting predictable response times," is purely functional language.  It is well accepted that language that simply describes the function to be performed is not sufficient disclosure to avoid a finding of indefiniteness.  *Aristocrat Techs.,* 521 F.3d at 1334.  Additionally, the Federal Circuit has rejected DMS' implicit argument that "devising an algorithm to perform that function would be within the capability of one of skill in the art," stating that such an approach would be "contrary to this court's law."  *Id*.

Third, many of the steps included in DMS' "algorithm" are presented as alternatives to each other within the specification, and would therefore be impossible (or at least unexpected) to perform as part of the same algorithm.  For example, the '051 Patent lists a series of alternative ways to search within one of the distributed computers, such as "Boolean, vector, and

probabilistic" techniques.  *See* '051 Patent at 2:55-58.  The specification in no way suggests that these should, or even *could,* be combined into one overarching algorithm, and yet DMS' proposed algorithm includes each of these steps as part of the "means for searching."  Clearly, DMS' proposed algorithm is at odds with the specification, and DMS is adding together unrelated steps in an attempt to find appropriate disclosure of an algorithm.

Fourth, as with the "means for storing …" limitation, DMS now proposes an algorithm and structure that is disputed by its own expert.  Contrary to what DMS now proposes, Mr. Cole stated that there are "multiple independent structures" that are "sufficient to accomplish" the "means for searching" limitation, which DMS inexplicably now wishes to combine into one giant algorithm for searching.  *See* Cole Dep. at 113:16-19.  When asked to "enumerate those separate alternative mechanisms," Mr. Cole identified the following excerpts from the specification:

1.  Column 2, lines 55 to 58;

2.  Column 7, line 58 to column 8, line 3;

3.  Column 7, lines 27 to 44;

4.  Column 3, line 65 to column 4, line 8;

5.  Column 4, lines 37-45;

6.  Column 7, line 58 to column 8, line 57;

7.  Using an operating system file name stored in a database as a proxy for the contents when searching the database is an algorithm for searching at least a [substantial] portion of such data based on a search query to identify documents of multiple types responsive to the query; and

8.  Presenting information to users in various formats, including but not limited to abstracts, excerpts, full text or compound documents is an algorithm for searching at least a [substantial] portion of such data based on a search query to identify documents of multiple types responsive to the query.

*See id.* at 113:13-118:13; Cole Decl., Ex. 4, at 23.

There is no adequate disclosure in the specification for an algorithm for the "means for storing" limitation, despite DMS' attempt to join together disparate and unrelated sections of the specification, and, therefore, the term should be found indefinite.

## V. THE ASSERTED CLAIMS REQUIRE A SPECIFIC CLASSIFICATION OF DOCUMENTS AND A SUMMARY PRESENTING THIS CLASSIFICATION TO THE USER

The '051 Patent specification and file history focus on the specific classification of "documents" by "document type" and "categories of document types" and summary based on this classification to distinguish the prior art Dialog system. *See* Section II, above. Yet, DMS' proposed constructions ignore the intrinsic record and seek to impermissibly broaden these terms, effectively and impermissibly reading them out of the claims.

### A. A "document type" is a classification, where each document falls within only one classification that is independent of the document subject matter, originating source record, or database in which the document was found.

| TERM/PHRASE (CLAIMS) | DEFENDANTS' CONSTRUCTION | DMS' CONSTRUCTIONS |
|---|---|---|
| Documents [of Multiple] Type / [Multiple] Document Types/ [Documents of Multiple] Document Types (1, 10, 14, 17, 18, 22) | Document classification, where each document falls within only one classification and that classification is independent of the document subject matter, originating source record, or database in which the document was found. | A document type is a kind of document, not the subject of a document. A news article is a kind of document, a news article. The subject of one news article can be war in the Middle East. The subject of another news article can be the history of the 17th century. Both articles are documents of the same type, news articles, despite having different subjects.<br><br>Document types are not limited to text documents, but can comprise text documents, video clips, graphic images, and so on. |

DMS agrees that "document type is a kind of document classification that is [1] independent of the document subject matter" and "independent of [2] originating source record as well as [3] the database in which a document is found."  DMS Br. at 40; *see also* '051 Patent

at 10:49-64; 8:62-63; Fig. 5; 2:32-33.   Because DMS agrees with the explicit language of Defendants' construction on these three issues, Defendants request that the Court adopt Defendants' proposed language.

There are three remaining disputes related to this term.   First, DMS' construction is a narrative description with example lists and vague statements and, as such, is not helpful to the Court or the jury in precisely defining the scope of the claims.   Second, DMS' construction improperly omits that each document is associated with only one document type.   Third, DMS' construction seeks to re-characterize the file format of a document, such as text, video clips, graphic images, etc., as the "document type" of a document, an approach that cannot be reconciled with the intrinsic record or other portions of DMS' own construction.

1.       **Each document is associated with only one "document type"**

That "each document falls within only one classification" is a requirement that follows from and is entirely consistent with the intrinsic record.   For example, in Figure 5 and throughout the specification, the '051 Patent provides a lengthy list of exemplary "document types."   *See, e.g.*, '051 Patent, Fig. 5, 8:57-65.   Nowhere in this lengthy list is an example of a type that overlaps with another.   This absence of overlap is both consistent with and required by the '051 Patent's explanation of how "sources of information (i.e., source records) can be ***sorted into many document types*** and then subsequently into categories."   *Id.* at 8:57-60 .   Use of the term "sort," rather than tag or mark with all relevant types, confirms that each document is associated with one, and only one, document type.   Confirming that a document is of a single document type, the specification emphasizes the "unique" nature of the document type for each document, explaining "when the magazine is loaded into the system, a text analysis process identifies ***each unique document type*** within the magazine with a code."   *Id.* at 9:13-16.   Moreover, adding the capability for a document to have multiple types is not something discussed or enabled in the

specification.

Finally, the specification explains that the described arrangement "preferably eliminate[es] duplicate documents discovered in the search of the domain." *Id.* at 4:57-5:7. To associate multiple "document types" with a single document would be contrary to the goal of avoiding duplicate reporting of a single document absent additional classification schemes not disclosed in the '051 Patent.

DMS fails to identify any portion of the specification that discloses or suggests that a document may have more than one document type. The only portion of the specification DMS cites on this issue does not relate to ***document*** types, but rather discusses "assign[ing] a document to more than one ***category*** depending on the circumstances." DMS Br. at 41. That is, each category includes one or more document types, and the document types in a particular category of a set vary depending on the user's background. *See id.* at 4:57-5:7 ("As described below, ***the various sets of categories allow a single document in a domain to be placed in different categories depending on which set of categories is being used***; the selection of which set of categories is to be used typically is based upon the identity of the user or a predetermined characteristic of the user ...."). Thus, the very purpose of categories of document types and sets of categories of document types is to facilitate each document being classified as one, and only one, document type, but still presented in search results in different "categories" that are helpful to the user.

DMS' construction is incorrect because it renders the concept of "categories" redundant. If, as DMS argues, a document could be of multiple "document types," then there would be neither a need nor a reason to have categories that aggregate based on document types. For example, the specification provides an example where, for one user, the document types "product

specifications," "manufacturer supplied descriptions," "product announcements," and "trade show information" are also individual categories, but for another user these four document types are grouped into a single category called "Product Information."  *See id.* at 9:25-40.  There would be no need for categories if a document of document type "trade show information" could also simply be tagged as document type "Product Information."  The first user could search for the four different document types and the second user could search for "Product Information" that would include the other four document types.

Thus, the specification consistently describes and requires a system where a document is associated with one, and only one, document type.

### 2. Text, image, and video are not "document types;" they are file formats

DMS fails to address or present any justification for expanding the term such that "[d]ocument types are not limited to text documents, but can comprise text documents, video clips, graphic images, and so on."  At best, this language is ambiguous and should be rejected.  It is unclear whether DMS is arguing (a) that a ***document*** can be an image, video, or other file format, (b) that image, video, and other file formats are ***document types***, (c) both, or (d) something else entirely.  The notion that images and videos, on their own, may be documents is addressed and refuted below.   But regardless of whether images and videos qualify as documents, nothing in the intrinsic record discloses or suggests that these file formats are the claimed "document types," and such a notion is contrary to DMS' own construction.

Despite its lengthy lists of document types, the '051 Patent never suggests that the "file format" of a document is the same as a "document type."  The term "video clips" does not appear in the specification, and the only mention of "graphic" is in terms of the format used to present "information" to the user.  '051 Patent at 8:53-57 ("The information may be presented to

the user in various formats, including but not limited to abstracts, excerpts, full text, or compound documents (i.e. documents that contain both text and graphics).").  Not only does this discussion have no relation to "document types," it emphasizes that the **same** document may be presented in a number of different text formats, as well as a format with text and graphics.  To paraphrase DMS' own construction, the file format of one news article can be an image, and the file format of another news article can be a video clip.  Both documents are of the same document type, news articles, despite having different file formats.[4]

### B.   The Parties dispute whether a "category of document types" includes some, but not all responsive documents of a particular type

| TERM/PHRASE (CLAIMS) | AGREED CONSTRUCTION |
|---|---|
| Categories of document types (1, 10, 11, 18, 22) | Collections of one or more document types |

In its Brief, DMS indicates that it agrees with Defendants' construction for "categories of document types."  DMS Br. at 11.  In order to confirm that the Parties in fact reached agreement and to avoid later disputes, Defendants requested that DMS confirm that a collection that includes some, but not other, responsive documents of the document type(s) within a given category is not a category of document types.  *See* Ex. H, 5/1/12 Zembek Ltr.  DMS indicated that it does not agree with this position, and thus, a claim scope issue remains.  *See* Ex. I, 5/7/12 Biggers e-mail.  Defendants request that the Court resolve this claim scope issue and reject DMS' position as contrary the intrinsic record.

Figure 2 below illustrates the Parties' remaining disagreement.  DT1 – DT6 illustrate document types responsive to a given query, where there are multiple documents of each type responsive to a query.  The dotted lines in Figure 1(a) (Defendants' position) illustrate two

---

[4] Not even DMS' expert supports its construction.  Conspicuously absent from Mr. Cole's report is an opinion that document types "can comprise text documents, video clips and graphic images,

examples of categories of document types, with the first including all responsive documents of DT1 and the second including all responsive documents of DT3, DT5, and DT6. The dotted line in Figure 1(b) (DMS' position) is simply an arbitrary grouping of documents – and not a category of document types – because it includes some, but not other, documents of various document types.



**Figure 2**

The claims themselves confirm Defendants' position. Plugging the agreed construction into the larger phrase "documents responsive to the query which fall within [each] / [various] **category**," as used in Claims 1, 10, 18, and 22, requires those claims to classify "documents responsive to the query which fall within [each] / [various] of the **one or more document types** corresponding to each category." That is, a classification that includes some, but not other, responsive documents for the one or more document types does not qualify as the claimed "category."

Beyond the claim language itself, the specification and file history contain examples that are incompatible with DMS' position. If a document falls into a particular category, it is precisely because of its **document type**, and not any other attribute. For example, the specification explains "[s]ometimes these categories may have a one-to-one relationship with the document types … or these categories may be comprised of several document types." '051

and so on," as advanced by DMS. Cole Decl., Ex. 4, at 6.

Patent at 10:23-30.   And, where a category includes multiple document types "***all of the documents responsive to the search query that fall within these categories [sic] are lumped together*** in [that] category."   *Id.* at 9:29-33.   If the category included anything less than all documents of the document types of that category, it would not be a category of document types, it would be a category of some other attribute.

Thus, the intrinsic record consistently indicates that a "category of document types" is a grouping of ***all*** documents of the one or more document types associated with the category. While Defendants believe this conclusion follows directly from the now-agreed construction, Defendants request that the Court resolve this claim construction issue by clarifying that responsive documents in a "category of document types" includes ***all*** responsive documents in one or more document types, not just ***some*** responsive documents of various document types.

**C.**   **"Summary of the number of documents responsive to the query" for each document type / category of document types**

| TERM/PHRASE (CLAIMS)[5] | DEFENDANTS' CONSTRUCTION[6] | DMS' CONSTRUCTIONS |
|---|---|---|
| Summary of the number of documents responsive to the query by type of document [independently of the source record from which such documents were obtained] | An identification of two or more document types and the total number of *documents responsive to the query* for each document type [independently of the source record from which such documents were obtained] | The summary depicts the number of responsive documents according to document type [independently of the source record from which such documents were obtained] |

---

[5] This chart contains the "summary" term as it appears in claim 17, as well as the parties' proposed constructions for that term. In claims 14 and 17, documents are summarized by "document type." In claims 1, 10, 18, and 22, documents are summarized by "category of document type." The parties agree that all of the "summary" terms are essentially the same except for that variation.

[6] Defendants' proposed construction in the Joint Statement included the language "responsive documents," but to clarify this claim scope issue discussed in subsection (3), below, Defendants are modifying their construction to return to the original claim language "documents responsive to the query."

1.     **The Summary Must Include Two or More Document Types/Categories of Document Types**

The first disputed issue is whether the summary can identify the number of responsive documents for only ***one*** document type (or, for some claims, only ***one*** category of document type), or whether it must identify the number of responsive documents for at least ***two or more*** document types (or, for some claims, two or more categories of document types).  The sole basis for DMS' proposed construction that the "summary" need only contain the number of responsive documents for one document type (or category of document types) is that the word "two" itself is not used in describing the summary.  *See* DMS Br. at 46-47.  But DMS ignores the claims' repeated use of words and phrases that mean "two or more."  Beyond that, the specification distinguishes "the system of the invention" from "typical on-line systems" that include only a single number of responsive results.

The language of claim 17 explicitly requires that the system identify documents of "***multiple*** document types" and then "summarize" those documents by "type of document:"

> 17. A method of storing, searching and retrieving information for use with a large domain of archived data of various types comprising:
>
> * * *
>
> electronically searching at least a portion of such data based on the query to ***identify documents of multiple document types*** responsive to the query; and
>
> sorting documents responsive to the query and ***presenting a summary*** of the number of documents responsive to the query ***by type of document*** independently of the source record from which such documents were obtained.

'051 Patent at Claim 17.  Thus, Claim 17 requires that the summary contain the number of responsive documents for ***two or more*** (*i.e.,* multiple[7]) document types.  Indeed, at his

---

[7] *See* http://www.merriam-webster.com/dictionary/multiple (last visited May 16, 2012) (defining

deposition, DMS' own expert agreed that the summary of this claim should display the number of responsive documents for all document types responsive to the query.  *See* Cole Dep., at 92:15-19 ("[Claim 17] says 'A summary of the number of documents responsive to the query by type,' and my initial read of that is yes, that you would show – for any type that satisfies it, that you would show a summary by that type.").  Since the claim explicitly requires that documents of multiple types be identified by the query, the summary must list the number of responsive documents for each of those two or more document types.  *See id*.

Claim 14 uses slightly different language but yields the same result.  Specifically, it states that the query identifies "documents of different types" – *i.e.*, documents of two or more types[8] – and then the summary lists the number of responsive documents for "each of the [different, hence two or more] document types" identified in the query.

Claims 1, 10, and 22 are straightforward, and explicitly state that the summary include "the number of documents responsive to the query which fall within *various* predetermined categories of document types."  For the language in these claims to make sense, "various" must mean two or more,[9] and these claims thus require that the summary contain the number of responsive documents for *two or more* categories of document types.

The final independent claim, Claim 18, requires the same conclusion for the same reasons.  It first requires "defining one or more sets of *categories* of document types" (with sets[10]

---

"multiple" as "consisting of, including, or involving more than one.").

[8] *See* http://www.merriam-webster.com/dictionary/different (last visited May 16, 2012) (defining "different" as "partly or totally unlike in nature, form, or quality.").

[9] *See* http://www.merriam-webster.com/dictionary/various (last visited May 16, 2012) (defining "various" in similar context as "of an indefinite number greater than one.").

[10] *See* http://www.merriam-webster.com/dictionary/set (last visited May 16, 2012) (defining "set" in similar context as "a number of things of the same kind that belong or are used together.").  DMS seems to agree that a set is necessarily a group of two or more, as it originally proposed construing "sets of categories of document types" to mean "Sets are groups or classes

containing plural "categories"), and then requires that the summary include "the number of documents responsive to the query which fall within ***each category*** in the selected set of categories."

Consistent with the explicit language of each independent claim, the ***only*** example in the patent of a summary, Figure 3, shows 6 categories in the summary:



'051 Patent at Fig. 3 (excerpted). The corresponding disclosure in the specification is no different. *See, e.g.*, *id.* at 7:45-57 (describing the multiple categories shown in Figure 3); 10:31-33 ("The results of the search and sorting processes are presented to the user summarized by categories along with the number of documents in each such category.").

Indeed, the *only* time the specification describes a summary that includes a single response count, it does so in the context of criticizing and distinguishing the prior art. Specifically, the specification describes "conduct[ing] a search on the topic of neon lasers in a typical on-line system" and receiving back only a single count of responsive documents. *See id.* at 10:49-54.  The specification goes on to explain that "[i]n contrast, the system of the invention … summarizes the results by category of document type." *See id.* at 10:60-64.

In short, all of the claims explicitly require, consistent with the specification, that the number of responsive documents for two or more document types (or categories of document types) be included in the "summary" of results.

of document types …." *See* Jt. Stmt. at 3.

2.      **The Summary Must Contain Both an Identification of Document Types (or Categories) and the Number of Responsive Documents for Each Document Type (or Category)**

The plain text of the remainder of Plaintiff's and Defendants' proposed constructions is actually fairly similar, in that both appear to require that the summary show both (1) an identification of the document types (or categories) and (2) the number of responsive documents for each of those document types (or categories).   Therefore, Defendants ask the Court to construe "summary" to include both of these requirements.[11]

The applicant in the file history emphasizes that the claimed summary by document type, "present[s] to the user information responsive to a query in a much more usable fashion." 5/18/95 Resp. to OA at 3.   If a summary did not have to include an identification of the document types (or categories) corresponding to each count of responsive documents, such a summary would fail to provide the very information fundamental to the claims.   Nor would it actually provide a "summary" of anything.   Such a result is nonsensical.

3.      **The Summary Must Summarize a Single Query and Must be a Single Summary**

The background section of the '051 Patent describes a shortcoming of the existing prior art search systems in which the user often ran the same search multiple times, selecting different databases for each search.   *See* '051 Patent at 1:23-29 (noting that in the prior art the search "process must be repeated each time another source (database) or group of sources is selected"). *Id.* at 1:23-26.  This repeated searching and corresponding multiple search result screens "places on the user the burden of organizing and assimilating the multiple results generated from the launch of the same query in each of the multiple sources (databases)."  *Id.* at 1:26-29.   DMS

---

[11]  Defendants request this clarification because Mr. Cole testified in his deposition that "it's conceivable" that the summary of Claim 17 could not identify the document types being summarized.  Cole Dep. at 85:12-15.

itself emphasized this same shortcoming of the prior art in its Opening Brief. *See* DMS Br. at 5-6 ("This process also burdened the user with organizing and assimilating the multiple results generated from the launch of the same query in each of the multiple databases that the user wanted to search.").

Based on the specification and DMS' comments, as well as the plain language of the "summary" limitations in the claims, it follows that two separate search result screens should not collectively be within the scope of the claimed "summary" limitations. However, to the extent understood, DMS' Infringement Contentions to some defendants appears to argue that the claimed "summary" *is* an arbitrary designation of multiple separate search result screens generated by the user selecting different databases.[12] Defendants therefore seek clarification that multiple separate results screens cannot be arbitrarily designed collectively as the claimed "summary" because such a combination is (1) not responsive to a single query, and (2) not a summary at all.

First, the plain language of the claims requires "a summary of the number of documents *responsive to the query*." It follows from this plain language that the summary must summarize documents responsive to a single query action. Two search result screens responsive to two different database queries are not collectively responsive to any one query and therefore not within the scope of the summary term.

Second, a combination of two different search result screens is not a summary.[13] As the

---

[12] It is necessary for DMS to point to multiple separate search result screens as a single "summary" because no one results screen includes multiple responsive document totals. That is, each individual search result screen provides only the total responsive results for the single database searched.

[13] This conclusion follows directly from the plain language of the claims, but DMS' vague infringement theories inject ambiguity regarding the claim scope. Similarly, Mr. Cole was asked to confirm that a "summary" must be shown to the user all at once on one screen and Mr. Cole

'051 Patent explains, a system in which the user is forced to review multiple search result screens "places on the user the burden of organizing and assimilating the multiple results."  '051 Patent at 1:26-29; *see also* DMS Br. at 5-6.  The '051 Patent sought to solve this shortcoming by providing the claimed "summary."

Thus, Defendants request that the Court resolve the claim scope issue and confirm that two separate search result screens is not within the scope of the claimed "summary" limitations.

## VI.  THE '051 PATENT DISCLAIMED SEARCHING LESS THAN SUBSTANTIALLY THE ENTIRE DOMAIN

Both the '051 Patent specification and file history focus on searching substantially all data in the system as distinguishing the invention from the prior art Dialog system.  *See* Section II, above.  Yet, DMS' proposed constructions of what must be searched ignores the intrinsic record and renders the term boundless and indeterminate.

### A.  "At least a substantial portion [of such data]" means substantially the entire domain (not just a single database or a few selected databases) or the term is indefinite

| TERM/PHRASE (CLAIMS) | DEFENDANTS' CONSTRUCTION | DMS' CONSTRUCTIONS |
|---|---|---|
| At least a substantial portion [of such data] (1, 14, 22) | Substantially the entire domain (not just a single database or a few selected databases) | A substantial portion is a considerable portion of the data, notably large in size, amount, or extent, optionally but not necessarily the entire search domain. |

Defendants' proposed construction is taken directly from the specification and reflects the numerous statements made in the specification and file history distinguishing the claimed

---

responded:

> Assuming that everything fits on one screen, I would presume that you would, but it's certainly conceivable that you could have a result that include more types or more articles in the way that you had it presented here, or was, for some other reason, formatted to occupy multiple screens.

Cole Dep. at 93:10-93:15.  Mr. Cole seemed to agree with the clarification sought by Defendants, but created "conceivable" ambiguity where there should be none.

invention from the prior art.  DMS' lengthy, vague, and confusing construction is wrong because it defines "portion" in terms of absolute size, rather than comparing the "portion" searched to the entire domain available to search.  It does so through improper reliance on general-purpose dictionaries rather than the intrinsic record.  Moreover, DMS' expert was unable to express any meaningful bounds to the term under DMS' construction, rendering it indefinite.

Turning first to the language itself, the claim language surrounding "at least a substantial portion" indicates that "substantial portion" is a relative term related to the entire domain of data stored.  For example, Claim 1 recites a "means for **storing a large domain of data**" and means for searching **at least a substantial portion of _such_ data**."  Thus, "at least a substantial portion" refers to "such data," which finds its antecedent basis in the "large domain of data" stored in the system.  DMS' construction, which defines "substantial" in terms of absolute size rather than in comparison to the stored "large domain of data" cannot be reconciled with the plain claim language.[14]

Turning to the specification, it (1) defines what is meant by "at least a substantial portion" and (2) distinguishes the claimed invention from the prior art on that basis.  The specification explains that "the search process can utilize any index and search engine techniques … **as long as a substantial portion of the entire domain of archived textual data is searched**

---

[14] DMS argues that the doctrine of claim differentiation "presumes that 'at least a substantial portion' [as used in Claims 1, 14, and 22] must have a different scope than 'substantially all of the data' [as used in Claim 18]."  DMS Br. at 44.  But claim differentiation doesn't necessarily apply because the claims DMS cites to are independent claims with a variety of differences between them – DMS cannot point to any two claims that differ only as to this term.  Beyond that, the Federal Circuit has explained that "claim drafters can also use different terms to define the exact same subject matter."  *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006).  Indeed, "claim differentiation is not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history," and here the differentiation that DMS attempts to make is contrary to the written description and file history.  *See Marine Polymer Techs. v. Hemcon, Inc.*, 2010-1548 (Fed. Cir. March 15, 2012)

*for each query* …." '051 Patent at 2:55-58. Similarly, the specification distinguishes "the system of the invention" from the prior art Dialog system: "In contrast, *the system of the invention* not only searches *substantially its entire domain (not just a single database or a few selected databases)*, but also summarizes the results by category of document type." *Id.* at 10:60-64. Defendants' construction is taken directly from the latter quotation. In contrast, DMS' proposed construction, which would arguably encompass a search of only one of 20 available databases if the content of that one database is "large in size," cannot be reconciled with the specification.

Turning to the file history, although there were only two substantive office action responses, the applicant made *no less than four separate statements* consistent with Defendants' construction. These admissions by DMS emphasized the importance of searching substantially the entire domain, and characterized searching substantially the entire domain as a "contrast" with, an "additional advantage" over, and even "a fundamental difference" with the prior art Dialog system:

> Moreover, because *Applicant's system does not exclude supposedly irrelevant groups of data (in contrast to Dialog),* sometimes the user of Applicant's system discovers valuable information that they would not have even thought to look for …. As illustrated in Figure 5, however, because *Applicant's system is designed to search even information believed to be irrelevant*, this piece of information would be reported to the user (under the "Category" of "Licensable Technology") even though the user was not looking for it.

5/18/95 Resp. to OA at 8-9.

> This comment illustrates an advantage of Applicant's system over the Dialog system-in Applicant's system, *substantially all of the databases can be searched every time*, so that the environmental searcher frequently may retrieve information in categories where he or she might not have thought to look.

(internal citations omitted) (Ex. J).

*Id.* at 9.

> This comment highlights *a fundamental difference between Dialog and Applicant's system*. While Dialog permits a user to select groups of files in which to search (e.g., by using the command set files products in file 411 - see page 24 of Dialog), selecting only- certain files to search in the Dialog strategy, by design, precludes the possibility that the searcher will find information in an "illogical" file ....  *In contrast, Applicant's system permits the user to search through all databases (even ones thought to be irrelevant)* ….

6/27/96 Prelim. Amend. at 4.

> This categorization technique has *an additional advantage over Dialog*. In Dialog, the user must be familiar with the names of the databases in. which he or she desires to search. … *In applicant's system, however, the database can be added so that searches are automatically launched in the database* ….

*Id* at 5.

These statements in the prosecution history "provide[] evidence of how … the inventor understood the patent."  *See Phillips*, 415 F.3d at 1317 (citing *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992)).  Thus, DMS' statements, along with the rest of the intrinsic record, are consistent with Defendants' construction and contrary to DMS' current construction.

As a second, separate reason to adopt Defendants' construction, each of the specification and the file history statements discussed above are separate disclaimer statements disavowing any broader claim scope.  "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).  The applicant, both in the patent specification itself as well as the file history, made numerous statements, detailed above, distinguishing the claimed system from the prior art Dialog system because the claimed system searches substantially all available information (not a few selected databases).  Each of these statements is

a separate disclaimer statement consistent with Defendants' construction. *See Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998) ("Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover.").

Finally, DMS' construction is wrong because it would render the claim indefinite. Defendants asked DMS' expert, Tipton Cole, to identify what one of ordinary skill in the art would understand the bounds of "at least a substantial portion" to be:

> Q: How would a person of ordinary skill know when they've crossed the threshold from searching just a portion of the data into substantially at least a substantial portion of the data?
>
> A: I'm not sure that there's a bright-line test for that.
>
> Q: Do you know what that would depend on?
>
> A: We discussed several possible counts of databases, counts of records, counts of bytes, counts of documents; any of those could be used as a metric on which you could take a fraction of the whole and decide whether it's substantial or at least a portion.
>
> Q: Could it depend on who you ask?
>
> A: I'm sure that it would depend upon who you ask and the circumstances therein, yes.

Cole Dep. at 152:7-21.

DMS' construction should be rejected because, as Mr. Cole made clear, one skilled in the art would not understand the bounds of the claim phrase "at least a substantial portion," or DMS' proposed construction of that term.[15]

---

[15] Definiteness problems arise when "words of degree" such as "about," "approximately," and "substantially" are used in a claim. *Seattle Box Co. v. Indus. Crating & Packing, Inc*., 731 F.2d 818, 826 (Fed. Cir. 1984). "When a word of degree is used, the district court must determine whether the patent's specification provides some standard for measuring that degree. Thus, there must be an objective standard to determine the scope of a word of degree such that a person of ordinary skill in the art would understand what is claimed when the claims are read in light of the specification." Order, *KLA-Tencor Corp. v. Xitronix Corp*., No. 1:08-cv-723-SS (W.D. Tex. Jan. 31, 2011), ECF 210 (quotations and citations omitted) (Ex. K).

**B.**     **The prosecution history requires "at least a portion" to mean substantially the entire domain (not just a single database or a few selected databases)**

| TERM/PHRASE (CLAIMS) | DEFENDANTS' CONSTRUCTION | DMS' CONSTRUCTIONS |
|---|---|---|
| At least a portion (10, 17, 18) | Substantially the entire domain (not just a single database or a few selected databases) | At least a portion of such data means some of the data. |

Defendants' construction, which is the same as its proposed construction for "at least a substantial portion," is correct because numerous disclaimer statements in the specification and file history overrule the plain meaning of the phrase.  DMS, once again, leads its arguments not by citing to the intrinsic record, but rather by citing to general purpose dictionaries.  Should the Court disagree with Defendants that the applicant disclaimed anything but a "substantial" portion, DMS' construction is still incorrect because it is not consistent with the specification.

As discussed above, the specification distinguishes "the system of the invention" from the prior art Dialog system: "In contrast, *the system of the invention* not only searches *substantially its entire domain (not just a single database or a few selected databases)*, but also summarizes the results by category of document type."  '051 Patent at 10:60-64.  The statement used to distinguish the prior art refers to "the system of the invention," not just claims that recite "a substantial portion."  As such, Defendants' proposed construction should apply to claims that recite "at least a portion."  *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (holding that when a patentee "describes the features of the 'present invention' as a whole, this description limits the scope of the invention.").

Similarly, the four statements from the prosecution history discussed above refer to "the Applicant's system" when distinguishing over the prior art.  As such, those statements apply to Applicant's entire system (*i.e.*, every claim), not just claims that recite "a substantial portion."  DMS cannot show that those statements somehow apply to some claims (*i.e.*, Claims 1 and 14

that recite a "substantial portion") but not others (*i.e.*, Claims 10, 17 and 18 that recite "at least a portion").  Each of these statements represents a separate disclaimer and the Court need only agree that any one of the statements rises to the level of a disclaimer to conclude that Defendants' construction is proper.

DMS' proposed construction is also wrong because it is unsupported by the intrinsic record.[16]  DMS cites to a single portion of the specification as supporting its construction.  *See* DMS Br. at 42 (citing '051 Patent at 6:22-34).  But, nothing in this passage suggests that the "system of the invention" can be met by simply searching "some" of the data, as DMS' construction proposes.  Rather, the passage describes limited circumstances where access rights limit access to certain documents.  *See* '051 Patent at 6:22-34.  Substantially all data is still searched.  Thus, the specification and file history are inconsistent with a construction in which only "some" data (which would include "just a single database or a few selected databases") is searched.

## VII.   DMS' SEEKS TO IMPROPERLY EXPAND THE SCOPE OF INFORMATION COVERED BY THE CLAIMS

### A.   The term "document" does not require construction, other than rejecting DMS' attempt to expand the term to "any work of authorship"

| TERM/PHRASE (CLAIMS) | DEFENDANTS' CONSTRUCTION | DMS' CONSTRUCTIONS |
|---|---|---|
| Document (1, 10, 14, 17, 18, 22) | No construction. | A work of authorship of a particular type contained in a source record.  Documents are not limited to text documents, but can comprise text, video, graphic images, and so on. |

Defendants believe that the term "document" is easily understood and needs no construction.  DMS, for its own strategic reasons, opposes this position, and applies a

---

[16] In the event the Court does not find a disclaimer, DMS' construction is still not correct, and Defendants propose the alternative construction:  "***not just a single database or a few selected databases.***"

nonsensical and unhelpful definition that adds no clarity to the claims.  Unless there is some compelling reason to construe the word "document," it should mean "document."  DMS is concerned, and for good reason, that the ordinary meaning of document will not include videos and graphic images.  It is also concerned that the plain meaning of "document" will not cover "and so on," whatever that might mean.  The reason such concern is justified is that there is no teaching in the specification that supports such an expansion, and adopting DMS' construction ultimately requires a finding that the Asserted Claims are invalid as not enabled.  *See Sitrick v. Dreamworks*, 516 F.3d 993, 999 (Fed. Cir. 2008) ("Enabling the full scope of each claim is 'part of the quid pro quo of the patent bargain.'") (quoting *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1244 (Fed. Cir. 2003)).

DMS also cites to extrinsic evidence for the meaning of "document."  While the term "document" may have a larger meaning outside the universe of the '051 Patent and the claimed invention, such as under the FEDERAL RULES OF CIVIL PROCEDURE, this evidence does not address documents contained in source records.  The term must be construed as it would be understood by one of ordinary skill, not based on how lawyers might torture it.  *See Phillips*, 415 F.3d at 1313.  Further, DMS' proposed construction appears nowhere in the extrinsic evidence.

The term "document" need not be construed.  The term "document" should certainly not be given DMS' construction, which seeks to improperly shoehorn in infringement arguments creating an improper construction.  Indeed, not even DMS' expert, Mr. Cole, advanced the argument that "documents are not limited to text documents, but can comprise text, video, graphic images, and so on" in his construction of the term.  *See* Cole Decl. Ex. 4,[17] at 3.

---

[17] Exhibit 4 to the Declaration of Joe Tipton Cole in Support of Plaintiff's Proposed Claim Constructions was filed as Exhibit E to Plaintiff's Opening Claim Construction Brief (ECF 101).

**B.      A "source record" is a collection of textual data containing documents that is loaded as a unit**

| TERM/PHRASE (CLAIMS) | DEFENDANTS' CONSTRUCTION | DMS' CONSTRUCTIONS |
|---|---|---|
| Source Record (1, 14, 17, 18, 22) | A collection of textual data containing documents provided to the system for loading as a unit | JCCS: A source record is a work of authorship, for example, an issue of a newspaper or a news article, an issue of a magazine or a magazine article, an issue of a journal or an article from a journal, and so on.  A source record is not limited only to textual data.<br><br>Plaintiff's Opening Claim Construction Brief: "A collection of data containing documents." |

In its Brief, DMS proposes a new construction for the meaning of the term "source record," which more closely tracks Defendants' proposed construction and the intrinsic evidence. The remaining two disputes related to this term are discussed below.

### 1.      A "source record" is a collection of textual data

The '051 specification defines the term source record:  "The ***collections of textual data (i.e., the source records)*** are typically obtained either in electronic form, or are obtained in hard copy form and then converted to electronic form."  '051 Patent at 10:1-4.  DMS fails to identify anything in the intrinsic record that suggests a different definition should control.

While as DMS notes a "typical trade magazine" is an example of a source record, this does not support its argument that a source record can contain graphics, since "typical trade magazines, of course, include not only textual data but graphic images as well."  DMS Br. at 48. The patent is explicit about what content is envisioned to be in a "typical trade magazine" – "several types of information, such as editorials, regular columns, feature articles, news, product announcements, and a calendar of events" – and nowhere in this list is any type of graphic content.  '051 Patent at 8:61-63.  Defendants' proposed definition is consistent with the patent's definition of what types of data are contained in the "typical" trade magazine, which are all different types of textual data.

DMS also points to a discussion in the '051 Patent that "the system may be adapted for use with *any type of information desired*)," and the "information may be presented to the user in various formats, including but not limited to abstracts, excerpts, full text, or *compound documents (i.e., documents that contain both text and graphics)*."  DMS Br. at 48-49 (quoting '051 Patent at 8:47-57) (emphasis added by DMS).  DMS' reliance on this passage is misplaced for at least three reasons.  First, this passage does not speak of source records; while the system may be used with any type of information desired, and may be presented with text and graphics, this does not speak to the content of the source record.  Second, DMS ignores that the very opening sentence reinforces the notion that the '051 Patent describes a "domain of archived *textual* data," which would be the data that came from the source records.  Third, while the specification describes the notion of presenting a "compound document" to the user that contains both text and graphics, the asserted claims at issue deal with storing, typing, and searching "documents."  Beyond that, a "compound document" still includes text.  DMS would have source records include documents that are purely videos or images – which is not contemplated or supported at all by the disclosures in the patent.  The limited disclosure regarding "compound documents" does not prove the breadth of "documents," nor does it broaden document to include video or images that do not contain any text at all.  DMS' arguments are misplaced.

2.    **A "source record" must be loaded as a unit**

Because the parties agree that a source record includes a collection of documents, the current construction implicitly – if not explicitly – requires loading as a unit.  The claims require an analysis of what is contained in the source record (*e.g.,* documents of multiple types), and therefore there must be some sense of how to draw the boundaries on a particular collection of textual data to delineate each particular source record.  Without such language, DMS could draw an arbitrary box around unrelated documents and declare them to be a "source record."

The specification confirms that the source record is loaded into the system as a unit. The only discussion in the specification on how a source record is handled states that a source record is obtained, converted to electronic form if not already in electronic form, and then loaded into the system. *See* '051 Patent, 10:1-4 ("The collections of textual data (i.e., the source records) are typically obtained either in electronic form, or are obtained in hard copy form and then converted to electronic form. In either case, the ***electronic form is loaded into the appropriate search engine(s) of the system***.").

Figure 5 also supports this, showing "five typical sources of information (i.e. source records)" as "Input to Domain":



'051 Patent at Fig. 5; *see also id.* at 8:58-59.

This limitation makes sense, as one reading the patent can look at each collection of textual data loaded into the system as a unit to determine if any of that data contains documents of multiple types, as required by the independent claims of the '051 Patent. Moreover, there is no disclosure or suggestion in the specification that a source record should or could be partially loaded. Instead, the disclosure is about handling "source records" as a whole.

The only intrinsic evidence identified by DMS fails to support its construction. DMS argues that the notion of removing duplicates supports that a source record need not be loaded as a unit, but this argument is misplaced, and in fact supports Defendants' construction. DMS Br.

at 50-51.  Unless the source record was entirely present as a unit at the time of loading, there would be no way for the system to be able to fully analyze a source record in order to identify and remove duplicates.

## VIII.   THE ASSERTED METHOD CLAIMS REQUIRE STEPS BE PERFORMED AND CONTROLLED, IF PERFORMED AT ALL, BY THE USER

Two steps of each asserted method claim – "presenting a summary" and "generating an electronically executable query" – are performed, if at all, by a user and not any Defendant. DMS seeks constructions contrary to the intrinsic record because it must do so in order to have any chance of arguing infringement.  *See, e.g.*, *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007) ("Direct infringement requires a party to perform or use each and every step or element of a claimed method or product.").[18]  Indeed, DMS seems to lament its fate, conceding that "in a world in which a large proportion of presentations of summaries … occur in client-server architectures, construing claims 17 and 18 to require direct control of an output device greatly reduces or completely eliminates any possibility of direct infringement of these claims."   DMS Br. at 51.   The Federal Circuit has addressed this exact concern and responded that "this court will not unilaterally restructure the claim or the standards for joint infringement to remedy these ill-conceived claims."  *BMC Res., Inc.*, 498 F.3d at 1381.  Focused on the intrinsic record, Claims 17 and 18 are properly construed to require user action and DMS' concerns about proving its infringement case cannot override the proper constructions.

### A.   "Presenting" means displaying on an output device

| Term/Phrase (Claims) | Defendants' Construction | DMS' Constructions |
|---|---|---|
| Presenting (17 and 18) | Displaying on an output device | 'Presenting' refers to presenting a summary, which means preparing and causing the depiction of a number of responsive documents. |

---

[18] The "joint infringement" doctrine is currently subject to a Federal Circuit *en banc* review.

The plain meaning of "presenting" as used in claims 17 and 18 is to show or display an image to the user on an output device.  After all, "[t]he invention provides … [a] system … so that users may easily identify relevant information more efficiently and more conveniently than systems currently in use."  '051 Patent at 1:56-62.  The specification uses the phrase, or some similar variation, "present to the user" eight times.  As such, "presenting" is something that happens to the user, on his or her computer, and not something on a server completely decoupled from and independent of the user.

DMS' proposed construction is not even the same as its expert's construction, which explicitly requires user action.  Specifically, Mr. Cole believes that "presenting a summary means depicting the number of responsive documents."   Cole Decl., Ex. 4, at 5.   This construction correctly focuses on the fact that "presenting" refers to showing, or "depicting," something, not "preparing and causing the depiction," as argued by DMS.

The specification discloses two distinct modes in which the SAS can operate.  '051 Patent, at 4:11-12.  In the first mode, a dumb terminal configuration, "the SAS system 24 *generates* screens of display."  *Id.* at 4:16.  In the second mode, a client/server configuration, "the SAS system 24 accepts and executes transactions from a predefined set that allows for … search results [to be] *presented*."  *Id.* at 4:21-25.  In this second mode, the user's computer is "in complete control of the end user's display screen."  *Id.* at 4:25-26.  Claims 17 and 18 use the term "presenting" not "generating," and are therefore directed to the second, client/server, mode in which the user's computer, not the SAS, is in control of the end user's display screen.  Therefore "presenting," as used in Claims 17 and 18, requires an action by the user's computer, *i.e.*, displaying an image on an output device.  DMS' construction attempts to improperly rewrite the claims to recite "generating" instead of "presenting."

Extrinsic evidence also supports Defendants' proposed construction.   For example, another district court construing the same term in another patent reached a conclusion similar to that proposed by Defendants.   *See Paid Search Engine Tools, LLC v. Yahoo!, et al.*, Memorandum Opinion and Order, Case No. 1:07-cv-403 (E.D. Tex. Sept. 13, 2007), ECF 148 (construing "presenting" to mean "displaying") (Ex. L).   In addition, according the Online Oxford English Dictionary (cited by DMS in support of its constructions for four other terms) the relevant plain meaning of "present" is "to put before the eyes of someone; to hold forth to view; to show, exhibit, display."   Ex. M, OED ONLINE (Oxford University Press March 2012), http://www.oed.com/view/Entry/150679 (last visited May 22, 2012).   Thus, Defendants' construction is consistent with the plain meaning of "presenting" and the intrinsic and extrinsic evidence.

B.   **"Generating an electronically executable query" means a user entering search information and a system translating same into an electronically executable query**

| TERM/PHRASE (CLAIMS) | DEFENDANTS' CONSTRUCTION | DMS' CONSTRUCTIONS |
|---|---|---|
| Generating an electronically executable query (17 and 18) | user entering search information and system translating into electronically executable query | An electronically executable query is a query, created from search criteria, capable of electronic execution against a database management system, such as, for example, a query expressed in the Structured Query Language or 'SQL.'  Generating an electronically executable query is not user action. |

Because the claim language requires user action, DMS attempts to remove the action *generating* an electronically executable query and turn it into a noun – the electronically executable query.   Conversely, Defendants' construction correctly describes the step of generating a query as including action by the user of entering search information.  FIG. 3 "is a diagram illustrating a query formulation and search process utilized in the invention."   '051

Patent at 3:12-13.  FIG. 3 illustrates that the query generation process includes the user entering search information before the system translates that information into an electronically executable query.  Without that user action, an electronically executable search query cannot be generated.

DMS appears to misinterpret Defendants' construction to require that the user perform the entire step of "generating an electronically executable query."  *See* DMS Br. at 55 ("it is the system that constructs the electronic query, not the user.").  The plain meaning of Defendants' construction requires action by ***both*** the user <u>and</u> the system: "user entering … and system translating."  DMS' description of Defendants' construction leaves out the system's contribution.

Finally, DMS' expert again offers a construction that differs from that of DMS.  Like DMS, Mr. Cole transforms the action of generating a query into the query itself.  Notably, however, Mr. Cole's construction correctly recognized the need for user action in query generation – "a query, generated from ***user search input***."  Cole Decl., Ex. 4, at 9.  Mr. Cole's sole support for his construction is that the user is part of the query generation step.  *See id.* (citing '051 Patent at 6:38-43 ("Such a system ***allows the user*** to enter their description of the information needed using simple words/phrases made up of "natural" language and to rely on the system to assist in generating the full search query …."}).

In sum, Defendants request that the Court adopt Defendants' construction that requires that the user enter search information and that the system translate that information into an electronically executable query.

## IX.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court find the § 112, ¶ 6 terms indefinite and adopt Defendants' proposed constructions attached as Exhibit N.

Respectfully submitted by:

Dated: May 25, 2012

**Attorneys for Defendants Alexa Internet, Inc., Elsevier B.V., LexisNexis, Lycos, Inc., WebMD, LLC, and Yahoo!Inc.**

/s/ *Richard S. Zembek*

Dan D. Davison
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
214-855-8000
Fax: 214-855-8200
ddavison@fulbright.com

Joseph P. Zammit
**Fulbright & Jaworski L.L.P.**
666 Fifth Avenue
New York, NY 10103
212-318-3000
Fax:212-318-3400
jzammit@fulbright.com

Richard S. Zembek
Daniel Leventhal
Daniel Prati
**Fulbright & Jaworski L.L.P.**
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
713-651-5151
Fax: 713-651-5246
rzembek@fulbright.com
dleventhal@fulbright.com
dprati@fulbright.com

Dated: May 25, 2012

**Attorneys for Defendants Google Inc. and IAC/InterActiveCorp**

/s/ *Alan D Albright*

Alan D Albright
**Bracewell & Giuliani LLP**
111 Congress Avenue, Suite 2300
Austin, Texas 78701
Tel: 512-472-7800
Fax: 512-472-9123
alan.albright@bgllp.com

Christopher Schenck
**Bracewell & Giuliani LLP**

701 Fifth Avenue, Suite 6200
Seattle, Washington 98104
Tel: 206-204-6200
Fax: 206-204-6262
chris.schenck@bgllp.com

Dated: May 25, 2012

**Attorneys for Defendants Thomson
Reuters Corporation and Dow Jones &
Company, Inc.**

/s/ *David Weaver*
David Weaver
James Shead
**Vinson & Elkins**
2801 Via Fortuna, Suite 100
Austin, TX 78756
512-542-8651
Fax: 512-236-3476
dweaver@velaw.com
jshead@velaw.com

Hilary Preston
666 Fifth Avenue
New York, NY 10103
212-237-0129
hpreston@velaw.com

CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on May 25, 2012.  Any other counsel of record will be served via electronic and first class mail.

/s/ Richard Zembek

H. Barrett Spraggins                                            Via CM/ECF
Henry Artoush Ohanian LLP
John R. Biggers
**BIGGERS AND OHANIAN LLP**
515 Congress Avenue, Suite 1400
Austin, Texas 78701
barrett@biggerslaw.com
artoush@biggerlaw.com
john@biggerslaw.com

*Counsel for Plaintiff Document Management Systems LLC*

Alan D Albright                                                  Via CM/ECF
**BRACEWELL & GIULIANI LLP**
111 Congress Avenue, Suite 2300
Austin, Texas 78701
Tel: 512-472-7800
Fax: 512-472-9123
alan.albright@bgllp.com

Christopher Schenck
**BRACEWELL & GIULIANI LLP**
701 Fifth Avenue, Suite 6200
Seattle, Washington 98104
Tel: 206-204-6200
Fax: 206-204-6262
chris.schenck@bgllp.com

*Attorneys for Defendants Google Inc. and IAC/InterActiveCorp*

Dan D. Davison                                                  Via CM/ECF
**FULBRIGHT & JAWORSKI L.L.P.**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
ddavison@fulbright.com

Joseph P. Zammit                                          Via CM/ECF
**FULBRIGHT & JAWORSKI L.L.P.**
666 Fifth Avenue
New York, New York 10103
jzammit@fulbright.com

Richard S. Zembek                                         Via CM/ECF
Daniel S. Leventhal
Daniel A. Prati
**FULBRIGHT & JAWORSKI L.L.P.**
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
rzembek@fulbright.com
dleventhal@fulbright.com
dprati@fulbright.com

*Counsel for Defendants Alexa Internet, Elsevier B.V., LexisNexis, Lycos, Inc.,*
*WebMD, LLC, and Yahoo! Inc.*

David Weaver                                              Via CM/ECF
James Shead
**VINSON & ELKINS**
2801 Via Fortuna, Suite 100
Austin, Texas 78756
dweaver@velaw.com
jshead@velaw.com

Hilary Preston
666 Fifth Avenue
New York, NY 10103
212-237-0129
hpreston@velaw.com

*Counsel for Thomson Reuters Corporation and Dow Jones & Company, Inc.*