IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | |
|---|---|
| DOCUMENT MANAGEMENT SYSTEMS LLC, <br><br>      Plaintiff, <br><br>      v. <br><br> ALEXA INTERNET, INC.; <br> DOW JONES & COMPANY, INC.; <br> ELSEVIER B.V.; <br> GOOGLE INC.; <br> IAC/INTERACTIVECORP; <br> LEXISNEXIS; <br> LYCOS INC.; <br> THOMSON REUTERS CORPORATION; <br> WEBMD, LLC; <br> YAHOO! INC.; <br><br>      Defendants. | C.A.  No:_____1:11-cv-332-SS_____ <br><br><br><br><br> JURY TRIAL DEMANDED |

**PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................4

II.  CONSTRUCTION OF DISPUTED CLAIM TERMS ....................................4

    A.   means-plus-function claim terms.............................................................4

        1.   The means-plus-function terms require no supportive
            algorithmic structure ...................................................................4

        2.   To the extent that the claims are deemed to require
            additional structural support, they do not need much ...........5

        3.   To the extent that additional support is deemed to be
            needed, the specification sets forth entirely sufficient
            supportive structure.....................................................................6

        4.   Defining an algorithm as a step-by-step description does
            not limit algorithmic structure as to form ...............................7

    B.   "source record" ........................................................................................8

        1.   A "source record" is not limited to text only...........................8

        2.   A "source record" may be defined as being published as
            a unit............................................................................................9

    C.   "document"................................................................................................9

    D.   "document type" .....................................................................................10

    E.   "category of document types"................................................................11

    F.   "generating an electronically executable query" ................................13

    G.   "a portion," "a substantial portion," "substantially all" .................14

    H.   "summary of the number of documents responsive to the
        query"......................................................................................................16

        1.   The summary does not require any particular number
            of document types .....................................................................16

        2.   The summary does not require any particular form...........................18

    I.   "presenting" does not require an output device................................19

III. CONCLUSION ..................................................................................................21

2

# TABLE OF AUTHORITIES

*Finisar Corp. v. DirecTV Grp., Inc.*,

    523 F.3d 1323 (Fed. Cir. 2008)....................................................................................7

*In re Katz Interactive Call Processing Litigation*,

    639 F.3d 1303 (Fed. Cir. 2011)....................................................................................4

*Paid Search Engine Tools, LLC v. Yahoo!, et al*.,

    Memorandum Opinion and Order,

    Case No. 1:07-cv-403 (E.D. Tex. Sept. 13, 2007), ECF 148.....................................20

*Typhoon Touch Technologies Inc. v. Dell Inc.*,

    659 F.3d 1376 (Fed. Cir. 2011)....................................................................................5

To the Honorable Court:

Plaintiff Document Management Systems LLC ("DMS") hereby files its Reply Claim Construction Brief in support of its proposed construction of disputed claim terms in the patent at issue in this case, U.S. Patent No. 6,534,051 ("the '051 patent"). This Reply Claim Construction Brief responds to issues presented in Defendants' Opposition Claim Construction Brief filed May 25, 2012, Dkt 103.

## I.      INTRODUCTION

This Brief sets forth DMS's current best thought on claim construction. In DMS's constructions of "source record," "document," and "document type," DMS has modified its position in an effort to compromise with the Defendants so as to simplify and clarify the issues before the Court.

## II.      CONSTRUCTION OF DISPUTED CLAIM TERMS

### A.      means-plus-function claim terms

#### 1.      The means-plus-function terms require no supportive algorithmic structure

The means-plus-function claims in the '051 patent require no supportive algorithmic structure to meet the requirements of 35 U.S.C. § 112 ¶ 6. Functions in means-plus-function claims that can be achieved by any general purpose computer without special programming do not require any more structure than the general purpose processor that performs those functions. *In re Katz Interactive Call Processing Litigation*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). Also in *Katz* at 1316, the Court explained that such claims do not run afoul of the rule against purely functional claiming, because such functions are coextensive with the structure disclosed, that is, a general purpose processor. Examples of such functions considered by the Court in Katz include "processing," "receiving," and "storing." In the claims of the '051 patent, the functions of "storing," "searching," "categorizing," and "generating" are entirely coextensive with the structure of a general purpose computer as exemplified by their implementation on the Search

Administration Server in the specification of the '051 patent.  No further structure, algorithmic or otherwise, is required in support of these claims under 35 U.S.C. § 112 ¶ 6.

As an application of common sense in this case, the means-plus-function claims ought not require additional algorithmic structure.  The whole point of the requirement of algorithmic structure under 35 U.S.C.  § 112 ¶ 6 is to give means-plus-function claims a way to comply with 35 U.S.C.  § 112, ¶¶ 1 and 2, enablement and definiteness.  But the structure, operations, and scope of the means-plus-function claims in the '051 patent are trivially obvious to a computer programmer just from the plain meaning of the claim language itself.  And now, under the rule of *Katz*, this Court is empowered to take into account the obvious.

### 2.     To the extent that the claims are deemed to require additional structural support, they do not need much

To the extent that 35 U.S.C.  § 112, ¶ 6 is deemed to require any additional structural support in the present case, it does not require much.  What is 'sufficient structure' in this context "depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention."  *Typhoon Touch Technologies Inc. v. Dell Inc.*, 659 F.3d 1376, 1384 (Fed. Cir. 2011).  "The requirement of specific structure in § 112, ¶ 6 thus does not raise the specter of an unending disclosure of what everyone in the field knows …" Id..  The language of the claim itself, for example, "means for storing … documents of multiple types" advises a computer programmer that a computer is to be programmed to store documents in association with type codes.  By the time that programmer has also viewed the inverted file structure of Figure 4 and read its description in Column 8 of the specification, that programmer has an understanding of "means for storing" that easily meets the requirements of 35 U.S.C. 112.

The specification describes categorizing as sorting on document type and mapping document types into categories.  Such sorting and mapping are computer functions or algorithms well known to any computer programmer.  The only way to provide more algorithmic detail regarding sorting or mapping on document type is to provide source code or pseudocode for a bubble sort or an insertion sort, for example, and an applicant for a patent is not required to go that far:

For computer-implemented procedures, the **computer code is not required** to be included in the patent specification. See Aristocrat Techs., 521 F.3d at 1338 (the patentee is **not "required to produce a listing of source code or a highly detailed description of the algorithm** to be used to achieve the claimed functions in order to satisfy 35 U.S.C. § 112 ¶ 6"). **A description of the function in words** may "disclose, at least to the satisfaction of one of ordinary skill in the art, enough of an algorithm to provide the necessary structure under § 112, ¶ 6." Finisar, 523 F.3d at 1340.

*Typhoon Touch* at 1385-86 (emphasis added).

> **3.     To the extent that additional support is deemed to be needed, the specification sets forth entirely sufficient supportive structure**

The patent at issue at this point in *Typhoon Touch* is U.S. No. 5,379,057 (the '057 patent), and the pertinent claim term is "means for cross referencing."   The function of cross-referencing was described thus at 14:57-15:4 in the '057 patent:

> Cross–Referencing imports that, for each answer field, the entered response can be related to a library to determine if the response in the answer field is existent in the library. In other words, the answer information is cross-referenced against that specific library. If it is available in that library, then, corresponding to that library entry, an action is executed. For instance, the associated action can involve an overlay window that alerts the user of the fact of the match with the library entry, or displays the contents of an information field stored in association with that entry in the memory.

Id. at 1385.  In view of that level of detail in algorithmic support, the Court in *Typhoon Touch* concluded:

> **The specifications state that cross-referencing entails the steps of data entry, then storage of data in memory, then the search in a library of responses, then the determination if a match exists, and then reporting action if a match is found.** The district court's ruling that the term "means for cross referencing" is indefinite and invalidates the claims in which it appears is not in accordance with law. The judgment of invalidity on this ground is reversed.

Id. At 1385 (emphasis added).  The emphasis is added to highlight the level of algorithmic detail required by the Federal Circuit last November in *Typoon Touch* to qualify claims under 35 U.S.C. § 112 ¶ 6.  DMS argues that the specification of the '051 patent provides far more

algorithmic detail than was provided by Typhoon when at 4:55-60, the '051 patent describes "means for categorizing" as broadcasting by the SAS the user's search to the search complex, waiting for responses from search machines accepting the query, queuing by the search machines the query for search, asking the user if the user wishes to continue if no search machine accepts the query, if all columns respond or the user indicates that a partial search is acceptable waiting on search machines to report search results, receiving by the SAS from the search engines each returned document, identifying each document returned by document type, and assigning each such document to a particular category in a predetermined set…."  Similar high levels of algorithmic detail are provided throughout the specification and the drawings for all the means-plus-function claim elements as described in detail on pages 9-29 of Plaintiff's Opening Claim Construction Brief.

### 4. Defining an algorithm as a step-by-step description does not limit algorithmic structure as to form

Regarding the sufficiency of support for means-plus-function claims, as described in more detail below, DMS believes that the Defendants' overemphasize the theme of "step-by-step" description of algorithms describing *how* functions are performed.  The Defendants in their Opposition Brief rely heavily on the concept that the specification of the '051 patent fails to disclose "step-by-step" algorithmic structure.  The Defendants seem to believe that the specification of the '051 patent, in order to comply with § 112 ¶ 6, is required to label steps in some certain, special way, e.g., Algorithm Step 1:  Doing A; Algorithm Step 2:  Doing B; Algorithm Step 3:  Doing C; And so on…

In fact, DMS in its Opening Brief and Tipton Cole in his Reports have pointed out many supportive algorithm steps in the specification.  DMS admits that the steps are not labeled as apparently desired by the Defendants, but that is simply not required.  In fact, precedent and practice permit a patentee to express an algorithm in any understandable terms, including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.  *Typhoon Touch Technologies Inc. v. Dell Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011), citing *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).

**B.**      **"source record"**

DMS's original proposed construction, "a collection of data containing documents," is derived directly from the actual language of the claims themselves which clearly describe documents as contained in source records.  That original construction is consistent with the specification but reads **_nothing_** into the claims from the specification.  Today DMS proposes the construction, "a source record is a collection of data containing documents, text as well as non-text[, published as a unit]."  DMS proposes that there is a need for this in view of the Defendants continued insistence that source records (and therefore documents) are comprised of text only.  DMS further proposes this construction because, in a spirit of compromise, it harmlessly addresses the Defendants' concerns regarding delineation among source records.

**1.      A "source record" is not limited to text only**

DMS proposes the construction, "a source record is a collection of data containing documents, text as well as non-text[, published as a unit]."  According to the claims, source records, or at least some of them, contain documents of multiple types.  In addition, the specification advises at 8:47-57:

> ***The large (gigabytes) domain*** of archived textual data searchable by the system of the invention consists typically of technical, business and other information licensed from database producers, information licensed from publishers, and information created by the owner of the information retrieval system (***though, of course, the system may be adapted for use with any type of information desired***). The information may be presented to the user in various formats, including but not limited to abstracts, excerpts, full text, or ***compound documents (i.e., documents that contain both text and graphics***).

Emphasis added.  Documents as claimed are derived from source records.  Source records can contain "any type of information desired," including graphics.  The information "presented" to a user is search results containing documents of multiple types derived from source records that include any type of information including graphics.  The system of the invention can present any kind of information including graphics because the information in the search domain contains any kind of information including graphics.  The claims do not limit source records to text only.  The specification does not limit source records to text only.  And there is no reason now to read such a limitation into the claims.

## 2.      A "source record" may be defined as being published as a unit

DMS proposes that the correct construction of "source record" is, "A collection of data containing documents, text as well as non-text[,  published as a unit]."  That is, DMS now proposes to support the Defendants' construction of "source record" subject to the following minor changes: "A collection of ~~textual~~ data containing documents ~~provided to the system for loading~~ published as a unit."

A source record can correctly be defined as *published* as a unit – a construction that is at least not inconsistent with the specification where each and every example of a source record is in fact published as a unit, magazines, newspapers, conference reports, and so on.  On the other hand, the Defendants' construction is inconsistent with the specification, because it is literally impossible for a source record to be defined as *loaded* as a unit.  The loading process cannot possibly define a source record, because documents are loaded from source records that *pre-exist* loading.  That is, documents are loaded from source records that are *defined* as source records *before* loading occurs.  Any definition of source records based on unity, therefore, must be delineated at some point in time *prior* to loading.

Whatever the definition of source record is, it is clear from the specification that it is to include a trade magazine.  Under Defendants' construction, *loading* as a unit, a trade magazine would no longer be a source record if all editorials from multiple trade magazines were loaded together and then all the calendar information from multiple trade magazines were loaded together.  The specification is clear that the entities that are loaded into the search domain are documents.  The documents so loaded are derived from source records, but there is no indication in the claims or the specification that all the documents from a source record must be loaded together.  On the contrary, in view of the specification, it would be entirely sensible in loading today's newspapers, for example, that all op-ed pieces would be loaded together across papers, then all columns, then all news articles, and so on.

## C.      "document"

To reduce and clarify the issues before the Court, DMS proposes to adopt the Defendants' construction of "document," with one additional qualification.  The Defendants

propose that "document means document."  DMS proposes to adopt that definition with the addition of the limitation "text as well as non-text," so that DMS's currently proposed construction of "document" becomes, "a document is a document, text as well as non-text."

Regarding the kind of information comprising source records and documents, the specification advises at 8:47-57:

> ***The large (gigabytes) domain*** of archived textual data searchable by the system of the invention consists typically of technical, business and other information licensed from database producers, information licensed from publishers, and information created by the owner of the information retrieval system (***though, of course, the system may be adapted for use with any type of information desired***). The information may be presented to the user in various formats, including but not limited to abstracts, excerpts, full text, or ***compound documents (i.e., documents that contain both text and graphics***).

Emphasis added.  Documents are described in the claims themselves as derived from source records.  Source records can contain "any type of information desired," including graphics.  The information "presented" to a user is search results containing documents of multiple types derived from source records that include any type of information including graphics.  The system of the invention can present any kind of information including graphics because the information in the search domain contains any kind of information including graphics.  The claims do not limit documents to text only.  The specification does not limit documents to text only.  And the claims should be construed to include non-text as well as text.

### D.      "document type"

DMS agrees to adopt the Defendants' construction  – with the single exception of "each document falls within only one classification.  DMS supports this construction:  a document type is a document classification ~~where each document falls within only one classification and~~ that ~~classification~~ is independent of the document subject matter, originating source record, or database in which the document was found.

Document types can overlap.  The Defendants say document types cannot overlap and therefore each document can have only one type code.  DMS disagrees, referring to the types illustrated in Figure 5:  A Short Article could also be typed as a News Brief, a Research Paper a

Conference Paper, or a Report.  A Feature Article in a Trade Publication could also be typed as a Research Paper, a Product Announcement, or Trade Show Information.  And so on.

The use at 8:57-60 in the '051 patent of the word "sort" as opposed to "tag" or "mark" does not mean that there is only type code per document.  In fact, the reference itself, 8:57-60, indicates "sorted into many document types." The fact that the specification speaks of uniqueness in one example is not enough to write "only one type code" into the claims.

The expression at 4:57-5:7, "preferably eliminates duplicate documents," does not mean only one type code per document.  The discussion at 4:57-5:7 is a description of categorization and presentation of search results, not document type coding.  Even assuming a concern with duplicate reduction, that would be no reason to read a "only one type code" into the claims.

As a portion of the specification that discloses or suggests that a document may have more than one document type, DMS points to the claims, which recite no limitation of a document to a single type.  The Defendants in effect discover a consistency of treatment among example embodiments and urge the Court to read them into the claims.  DMS argues that the inventor scoped his claims as he was entitled to do.  There is no need to change claim scope by adding "only one type code" to the claims

DMS's construction does not render redundant the concept of "categories." "Categories" are a second layer of classification in addition to type coding, a layer that supports variations and customization in presentation of search results – for user convenience and clarity.  Document type coding and categories work well together, regardless of the number of type codes per document.  There is no need for limiting a document to a single type code.

Text, image, and video are document types, not file formats.  Image file formats include JPEG (Joint Photographic Experts Group), TIFF (Tagged Image File Format), GIF (Graphics Interchange Format), BMP (Windows bitmap file format), and so on.  Video file formats include MPEG (Moving Picture Expert Group), RM (RealMedia), SWF (Macromedia Flash), WMV (Windows Media Video), and so on.  These and the like are file formats.  Text, image, and video are document types.

### E.    "category of document types"

Here is a subject not addressed in DMS's Opening Claim Construction Brief.  DMS attempted to reduce the number of Markman issues by agreeing with the Defendants' construction – that categories of document types are "collections of one or more document types."  In subsequent communications, however, the Defendants indicated that their construction was not that simple.  In fact, the Defendants construe a category of document types as "a collection that includes some, but not other, responsive documents of the document type(s) within a given category is not a category of document types."  The Defendants present Figure 2 below and argue, "The dotted line in Figure [2](b) (DMS' position) is simply an arbitrary grouping of documents – and not a category of document types – because it includes some, but not other, documents of various document types."



Figure 2

DMS disagrees that Figure 2(b) somehow represents "DMS' position."  DMS's position is that the Defendant's original proposed construction was correct:  categories of document types are "collections of one or more document types."  DMS additionally notes in response that the Defendants' proposed construction is not a construction at all – it is a non-infringement argument.  Generally in the claims, "categories of document types" occurs in the context of generating a summary of the number of responsive documents, as here, from claim 1:

> … means for generating a summary of the number of documents responsive to the query which fall within various predetermined categories of document types.

Read in context, the meaning of "categories of document types" is clear.  The categories are used to summarize search results.  Both configurations in Figure 2 would seem to be equally useful for such summarization.  In the case of Figure 2(a), some number of responsive documents of type DT1 would be summarized in one category, and some number of responsive

documents of types DT3, DT5, and DT6 would be summarized in another category.  Similarly in the example of Figure 2(b), some number of responsive document of types DT1, DT2, DT3, DT4, DT5, and DT6 would be summarized in the category represented by a dashed line.  The fact that some documents of those types are not summarized as responsive is of no concern for purposes of claim construction or for infringement.  In Figure 2(b), it is clear that some number of documents is counted for summarization – the ones depicted as included within the dashed line apparently representing a category of document types.  For purposes of infringement, documents that are not processed in accordance with the claim limitations do not infringe – but the others do.  DMS's construction is correct:  categories of document types are collections of one or more document types.

### F.     "generating an electronically executable query"

DMS contends that "generating an electronically executable query" is properly construed thus:

> An electronically executable query is a query, created from search criteria, capable of electronic execution against a database management system, such as, for example, a query expressed in the Structured Query Language or 'SQL.' Generating an electronically executable query is not user action.

The Defendants assert that DMS attempts to use generating as a noun in order to remove user action from the claim.  DMS would agree to voice its construction as a verb:  "Generating an electronically executable query is creating from search criteria a query capable of electronic execution against a database management system."  Regardless whether "generating" is a noun or a verb, it is implemented on the server side, not the client side.  The claims are correctly scoped to the server side of client-server architectures. The draftsman of these claims clearly understood the risks of claiming functionality or structure on both sides of the client-server divide and obviously refrained.

Not only are the claims properly scoped to include no requirement of user action, but the specification clearly describes a system supporting the functionality of the claims operating exclusively on the server side.  Figure 3 clearly demonstrates a query generator that "generates a Boolean search strategy," that is, an electronically executable query, as being separate and

distinct from a user. Figure 3 and its explanation in the specification at 6:35-7:57 clearly describe a client-server architecture in which user activity is limited to the client side and query generation occurs only on the server side:



### G.    "a portion," "a substantial portion," "substantially all"

The prosecution history recites no disclaimer of searches of less than an entire search domain. None of the language in the prosecution history cited by the Defendants as disclaiming language is in fact disclaiming language. Searching irrelevant data does not disclaim searching less than all. The fact that Applicants' system *can* (i.e., is capable of) search all the database every time does not disclaim searching less than all. That Applicants' system *permits* (i.e., allows) the user to search all the databases (even one thought to be irrelevant) does not disclaim searching less. Applicants' system adding a database so that searches are automatically launched in that database does not disclaim searching less than all.

Another reason there is no disclaimer here is found in the Examiner's statement of reasons for allowance at page 2 of the Notice of Allowability of July 17, 1996:

> Information retrieval across distributed or multiple databases, such as in DIALOG TM, is well known, but search summaries in the prior art of record report the number of hits of a specified search term in the databases which correspond to multiple source records in the claims. In contrast, the claims comprise a set of features which includes reporting a summary of the number of hits by document type, where a document type is common to multiple source records. This combination of elements is not anticipated nor suggested by the prior art of record.

The Examiner was unconcerned with the quantity of data searched. The Examiner allowed the case because the Examiner believed that the patent's combination of document type coding and categorization and presentations of search results summaries was novel. Nothing in the prosecution history evidences any disclaimer of searches of less than all the data.

The concept of searching the entire domain is described in the specification as an example embodiment or possible effect of searching according to embodiments of the present invention. The inventor clearly did not intend that effect as a required limitation of his invention as claimed. To construe the various scopes of search that are recited in the claims — "a portion of the data," "a substantial portion of the data," and "substantially all of the data" — as *always* meaning the entire domain would not only impermissibly rewrite the claims but also render meaningless as least some of the distinctions recited in the claims. Searching an entire data domain is recited nowhere in the independent claims of the '051 patent. Searching "substantially all" of a search domain is an optional benefit of searching according to embodiments of the present invention, correctly relegated to dependent claim 21. The Defendants, however, at pages 3-5 of their Opposition Brief, misinterpret the prosecution history to require searching the entire search domain as an element of the present invention as claimed. Here are pertinent excerpts from Amendment A of 5/18/95, page 8, and Preliminary Amendment B of 6/27/96, page 4:

> … It is true that Dialog allows the user to only select the databases *believed* to be of interest, thereby excluding supposedly irrelevant information. With Applicant's system, however, the entire domain of information can be searched with every query--thus, the user does not have to be an expert at deciding which databases would be relevant. Moreover, if a user *believes* that a database is irrelevant, and that database is excluded from the search, the user will never know if that

database happened to contain a piece of relevant information. In Applicant's system, there is no need to exclude any databases.

… Thus, to reduce the amount of data the user must sift through, Dialog requires the user select only those databases thought to have relevant data. In contrast, Applicant's system permits the user to search through all databases (even ones thought to be irrelevant), and then provides a unique categorization technique to assist the user in identifying relevant data--i.e., of all the data responsive to the query, the user can choose to view only data that fails into a particular category, regardless of the source or database (i.e., "file") from which the data was obtained.

The meaning of the prosecution history is that, for the first time, searching an entire data domain *can make sense*, not that it is *required*. A Dialog searcher could search large quantities of data, even across databases within Dialog's search domain, but searches of large portions of the search domain under Dialog risked selecting irrelevant databases and missing selections of relevant databases. And without the document typing and categorization provided by the present invention, it was very difficult for a Dialog searcher to identify the quality of a search, whether the searcher had targeted the correct portions of the Dialog search domain.

The reason according to the file history that Dialog required the selection of limited databases was that Dialog's presentation of results was so unhelpful to a user that a Dialog search ***needed*** to be limited with respect to the search domain. In contrast, the '051 claims a presentation that is so beneficial to the user that there is no need for it to limit the size of the usable search domain. The '051 patent contemplates and in fact claims a scope of search domain from small, "a portion," to "substantially all" of the search domain. The inventor correctly scoped his claims with respect to search size, he was entitled to do so, and there is no need now to rewrite that claim scope.

      **H.**      **"summary of the number of documents responsive to the query"**

      **1.**      **The summary does not require any particular number of document types**

DMS maintains that its construction is correct, "The summary depicts the number of responsive documents according to document type," with no requirement regarding any

particular number of document types.  The Defendants, however, require that the summary include two or more document types.  DMS observes that the limitation "two or more" is not in the claims and ought not be added.  The Defendants accuse DMS of ignoring words of plurality, citing first the word "multiple" in claim 17 as meaning two or more.  DMS notes, however, that the word "multiple" in claim 17 is not applied to the summary.  Instead, "multiple" only modifies searching, as in "searching … to identify documents of multiple types."  By the time claim 17 describes the summary, it is again singular in number, "presenting a summary … by type of document," so that a search yielding only one document type would fit perfectly with claim 17 for purposes of summary.

Regarding claim 14, "each" can accommodate "one or more" as opposed "to two or more."  The Defendants, however, conclude that "each of the document types" should be read as "each of the [different hence two or more] document types" must indicate plurality, but it really need not do so.  In fact, "each" denotes focus on a singular item in the presence of the possibility of plurality.  Here is a usage note from Dictionary.com, last viewed June 6, 2012:

> **Usage Note:**  The traditional rule holds that the subject of a sentence beginning with *each* is grammatically singular, and the verb and following pronouns must be singular accordingly: *Each of the apartments has* (not *have*) *its* (not *their*) *own private entrance* (not *entrances*).

And here is a definition from Merriam-Webster Online, last viewed June 6, 2012:

> being one of two or more distinct individuals having a similar relation and often constituting an aggregate

And this is how "each" is used in claim 14, acknowledging the possibility of two or more, but treating them one at a time, so that if there is only one, that result fits with claim 14.

Regarding claims 1, 10, and 22, the Defendants conclude that "various" must denote plurality, but it does not.  According to Merriam-Webster Online, "various" just means "of different kinds" or "dissimilar in nature or form."  The claim language "fall within various predetermined categories of document type," therefore is properly read as describing the possibility of a ***different*** document type, not a compelling requirement of ***plural*** document types.

And in claim 18, we are simply back to the Defendants' conclusion that "each" means "many" when it does not.

The Defendants argue further on page 33 of their Opposition Brief that the examples in Figure 3 and elsewhere in the specification show a plurality of document types, or at least a plurality of categories. DMS acknowledges the truth of this and finds it natural. The overall purpose of the invention in question is to help searchers handle a lot of information, so it is only natural that examples in the specification should trend toward plurality. But it is also natural to believe that the inventor would have wanted his invention to be useful in small searches as well as large ones and scoped his claims accordingly. Again DMS cautions against finding trends or patterns in the specification and reading them into the claims.

**2.      The summary does not require any particular form**

There is no need to construe the claims to require that they set forth any particular form of summary. Defendants ask for a construction of summary that lays out a particular form of labeling of document types or categories or particular form of screen layout. Defendants state that both DMS and Defendants' construction appear to require that the summary show a label describing the summarized document types or categories. DMS believes that the Defendants' position on this is a non-infringement argument disguised as a request for claim construction. The Defendants are simply tweaking the claims with an eye toward infringement – and with no substantive justification under the rules of claim construction. The summary as defined in the claims requires only the number of documents responsive to the query for each document type or category of document types. There is no requirement for any particular type of labeling of document types. DMS believes the claims as written are clear and require no further construction.

The plain language of the claims does not require that a summary must address only a single query. The Defendants propose, "First, the plain language of the claims requires 'a summary of the number of documents responsive to the query.' It follows from this plain language that the summary must summarize documents responsive to a single query action." But it does not 'follow.' What does follow is that if the plain meaning of the claim is clear, then there is no need to add construction. And, under the plain meaning, an accused infringing device or product that provided two summaries simultaneous to either one query or to two queries would simply infringe twice, not escape from infringement by providing two instead of one.

No search result is a summary.  The Defendants argue that a summary must address only a single search result because "… a combination of two different search results is not a summary."  DMS responds that even a single search result is not a summary.  Search results are a set of responsive documents.  A summary is a summary of a number of responsive documents according to document type.  The Defendants then proceed to further confuse search results and search summaries, citing 1:26-29, "a system in which the user is forced to review multiple search result screens."  The reference states a benefit of searching according to embodiments of the present invention, not a limitation to be read into the claims.  Again, DMS expresses the hope that the Court will resist the Defendants' urge to find explanatory language in the specification and read it into the claims.

I.      "presenting" does not require an output device

DMS proposes a construction of presenting that does not require an output device.  On this issue the specification is clear.  The SAS can present search results to smart terminals or to dumb terminals.  4:11-29.  The Defendants' theory is that because claims 17 and 18 use the words "presenting" rather than "generating" then they must be exclusively directed to presenting to smart terminals, that is, for terminals that generate screens client-side.  In support of that, the Defendants cite 4:16 for the notion that the specification only describes "generating" in connection with a "first" mode of presentation, that is, to a dumb terminal – and only of "presenting" for smart terminals.  But that is not what the specification says:

> One mode supports end users that are calling with a **simple keyboard/display device** such as a Digital Equipment Corporation VT100 terminal (or equivalent terminal). In this mode the SAS system 24 ***generates*** **screens of display** and monitors the keyboard responses entered by the user to establish the information sought and ***present*** **the search results by category**.

> The second mode supports connections from **remote computing systems**. In this mode the SAS system 24 accepts and executes transactions from a predefined set that allows for a query to be generated, search to be run, and **search results *presented***. In this mode the remote computing system is in complete control of the end user's display screen and is responsible for the look and feel of the end user activity. This well-known mode of operation is commonly described as a Client/Server Architecture.

4:11-29, emphasis added.  Notice that the term "presenting" is used in exactly the same way both for dumb terminals and for smart terminals.  The difference is that for dumb terminals, terminals with no built-in display controls, the SAS must prepare the entire screen before handing it off to the dumb terminal.  Thus the specification in describing operations with respect to a dumb terminal has the SAS first generating a screen and then "presenting" search results by category, that is, handing a generated screen off across a network for display on a dumb terminal.  In the case of a smart terminal, the SAS need not go quite so far as to generate an entire screen; instead the SAS in "presenting" needs only hand off to the smart terminal enough information so that the smart terminal can generate a screen.  ***In neither case does the SAS exercise any direct control whatsoever over the client-side display.***  In both cases, "presenting" is complete when the SAS places the information on the network for transmission to a client device.  There is no requirement of client side activity for "presenting" as recited in the claims.

The intrinsic evidence of Figure 3 and its explanation in the specification at 6:35-7:57 demonstrate that presenting is entirely a server side process.  Figure 3 (which is set forth above on page 14 of this Brief) clearly depicts the presenting process on the server side of a client-server architecture.  Even the display function of Figure 3 is entirely server side.   For both the presenting function and the display function, the function is complete when the server places information on a network for transmission to a client.  The displaying function is completed on the server side when, for example, an SAS places on a network a generated document screen for transmission to a dumb terminal.  The displaying function is completed on the server side when an SAS places on a document information for transmission to a smart terminal that will generate its own screen.  The presenting function is completed on the server side when, for example, an SAS places on a network a generated summary screen for transmission to a dumb terminal.  The presenting function is completed on the server side when an SAS places on a network summary information for transmission to a smart terminal that will generate its own screen.

Extrinsic evidence is not contrary.  *Paid Search Engine Tools, LLC v. Yahoo!, et al*., Memorandum Opinion and Order, Case No. 1:07-cv-403 (E.D. Tex. Sept. 13, 2007), ECF 148 (construing "presenting" to mean "displaying"), as cited by Defendants, in fact does not construe the same claim language.  Claims 1 and 5 of the patent in *Paid Search Engine*, U.S. Pat. No. 7,043,45, recited respectively:

1. A method of managing offers for a keyword made to a search engine, … and presenting the adjacently-ranked authorized payment amounts for a plurality of target keywords *on a single display screen to a user*.

5. A method of managing offers for a keyword made to a search engine, …comprising presenting adjacently-ranked authorized payment amounts for a plurality of target keywords at one or more Internet search engines *on a single display screen*, …

That is, both claims specifically recite a display screen and claim 1 recites direct display to a user.  None of that applies to the claims in this case.  In fact, DMS suggests more generally that a construction of claims from a different patent bearing different claim language and with a different supportive specification can have little bearing on claim construction in this case.

## III.   CONCLUSION

For the reasons discussed above, DMS requests that the Court construe the foregoing disputed claim terms as it has proposed.

Respectfully submitted,

Date:    June 8, 2012            By:      /s/ *John Biggers*

John Biggers
TX Bar No.  02310100
Artoush Ohanian
TX Bar No.  24013260
Barrett Spraggins
TX Bar No.  24066132
BIGGERS & OHANIAN, LLP
P.O.  Box 1469
Austin, Texas  78767-1469
Telephone: (512) 472-9881
Facsimile: (512) 472-9887
john@biggerslaw.com
artoush@biggerslaw.com
barrett@biggerslaw.com

B.  Russell Horton
TX Bar No.  10014450
KINCAID & HORTON, L.L.P.
114 W.  7th Street, Suite 1100
Austin, Texas 78701
Telephone: (512) 499-0999
Facsimile: (512) 499-0816
rhorton@khs-law.com

ATTORNEYS FOR PLAINTIFF
DOCUMENT MANAGEMENT SYSTEMS LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on June 8, 2012, the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  The document was served on all counsel of record who are deemed to have consented to electronic service.  Local Rule CV-5(b)(1).  Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5, all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of this pleading by first class mail.

Respectfully submitted,

DOCUMENT MANAGEMENT SYSTEMS LLC

Date:   June 8, 2012            By:    /s/ *John Biggers*

John Biggers
TX Bar No.  02310100
Artoush Ohanian
TX Bar No.  24013260
Barrett Spraggins
TX Bar No.  24066132
BIGGGERS & OHANIAN, LLP
P.O.  Box 1469
Austin, Texas 78767-1469
Telephone: (512) 472-9881
Facsimile: (512) 472-9887
john@biggerslaw.com
artoush@biggerslaw.com
barrett@biggerslaw.com

B.  Russell Horton
TX Bar No.  10014450
KINCAID & HORTON, L.L.P.
114 W.  7th Street, Suite 1100
Austin, Texas 78701
Telephone: (512) 499-0999
Facsimile: (512) 499-0816
rhorton@khs-law.com

ATTORNEYS FOR PLAINTIFF
DOCUMENT MANAGEMENT SYSTEMS LLC